805 F.2d 484
 13 Media L. Rep. 1671
 Reverend Jerry FALWELL, Appellee,
v.
Larry C. FLYNT; Hustler Magazine, Inc., Appellants,
and
Flynt Distributing Company, Inc., Defendant.
Reverend Jerry FALWELL, Appellant,
v.
Larry C. FLYNT; Hustler Magazine, Inc.; Flynt Distributing
Company, Inc., Appellees.
 Nos. 85-1417(L), 85-1480.
 United States Court of Appeals,
Fourth Circuit.
 Nov. 4, 1986.
 
 1
 On Petition for Rehearing with Suggestion for Rehearing In Banc.
 
 ORDER
 
 2
 Prior report: 797 F.2d 1270 (4th Cir.1986).
 
 
 3
 The appellant's petition for rehearing and suggestion for rehearing in banc were submitted to this Court. In a requested poll of the Court, Judges Winter, Phillips, Sprouse, Ervin and Wilkinson voted to rehear the case in banc; and Judges Russell, Widener, Hall, Murnaghan, Wilkins and Chapman voted against rehearing the case in banc. As a majority of the Judges voted to deny rehearing in banc, and
 
 
 4
 As the panel considered the petition for rehearing and is of the opinion that it should be denied,
 
 
 5
 IT IS ADJUDGED AND ORDERED that the petition for rehearing and suggestion for rehearing in banc are denied.
 
 
 6
 Entered at the direction of Judge Chapman, with the concurrence of Judge Hall and Judge Butzner.
 
 
 7
 WILKINSON, Circuit Judge, with whom PHILLIPS, SPROUSE and ERVIN, Circuit Judges, join, dissenting from the denial of rehearing en banc:
 
 
 8
 I share with the court a profound repugnance for the communication in this case. For all the controversy that surrounds the Reverend Falwell, the communication was an utterly unwarranted and offensive personal attack. Moreover, Hustler magazine, which leveled that attack, is a singularly unappealing beneficiary of First Amendment values and serves only to remind us of the costs a democracy must pay for its most precious privilege of open political debate.
 
 
 9
 The jury verdict below, however, raises serious questions under the First Amendment which this court should consider en banc. Foremost among them is whether those in political life should ever be able to recover damages for no other reason than hurt feelings or, to use the terminology of tort law, because critical commentary inflicted upon them a degree of emotional distress. To permit political figures to recover solely for emotional harm may in the end circumvent the careful development of the law of defamation since New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). It surely will operate as a powerful inhibitor of humorous and satiric commentary and ultimately affect the health and vigor of all political debate.
 
 I.
 
 10
 Participants in public life are not powerless against attacks upon their reputations. They may bring an action in libel to protect against the false infliction of reputational harm. "Damage to reputation is, of course, the essence of libel." Monitor Patriot Co. v. Roy, 401 U.S. 265, 275, 91 S.Ct. 621, 627, 28 L.Ed. 35 (1971). Reputational harm and emotional harm are, however, very different things. No one, upon entering political life, should be expected to suffer malicious damage to his or her reputation. See Curtis Pub. Co. v. Butts, 388 U.S. 130, 155, 87 S.Ct. 1975, 1991, 18 L.Ed.2d 1094 (1967). But one does expect to endure emotional slights. There are, inescapably, emotional scars that accompany political participation. Indeed, if the electorate is to make informed choices, the political atmosphere will crackle with derision and approbation alike.
 
 
 11
 The Supreme Court has long sought to strike the balance between "vigorous debate on the public issues ... while at the same time affording protection to the reputation of individuals." Hutchinson v. Proxmire, 443 U.S. 111, 133-34, 99 S.Ct. 2675, 2687, 61 L.Ed.2d 411 (1979). To preserve the climate for free political debate, the Court has let persons speak their minds on public officials without inordinate fear of liability in tort. It has imposed one limitation on this broad freedom: public officials may sue in libel for defamatory falsehoods made either with knowledge of their falsity or with reckless disregard of truth. New York Times v. Sullivan, 376 U.S. 254, 279-80, 84 S.Ct. 710, 725-26, 11 L.Ed.2d 686 (1964).
 
 
 12
 The panel opinion now adds another limitation: a separate cause of action for political figures for speech that causes emotional distress. Private persons may recover for speech that causes such harm. Time, Inc. v. Firestone, 424 U.S. 448, 460, 96 S.Ct. 958, 968, 47 L.Ed.2d 154 (1976). And damages for mental anguish may be available to a public official after he has proved a defamatory falsehood. Gertz v. Robert Welch, Inc., 418 U.S. 323, 350, 94 S.Ct. 2997, 3012, 41 L.Ed.2d 789 (1974). It may be too that some public figures, professional athletes for example, may recover for the infliction of emotional harm through the press. Chuy v. Philadelphia Eagles, 595 F.2d 1265 (3rd Cir.1979) (en banc ).
 
 
 13
 But the Reverend Falwell is simply not that kind of public figure. It is true that he does not hold an office or cast a vote. Yet he is as integral a part of political life as those who do. Although the Supreme Court has recognized a difference between public officials and those public figures who owe their fame to nonpolitical achievements, that distinction is unpersuasive in this case. See Curtis Pub. Co. v. Butts, 388 U.S. 130, 155, 87 S.Ct. 1975, 1991, 18 L.Ed.2d 1094 (1967); Monitor Patriot Co. v. Roy, 401 U.S. at 271, 91 S.Ct. at 625. The Reverend Falwell is at the forefront of major policy debates; he enjoys the most intimate access to the highest circles of power; he possesses a forum for presenting his views and establishing his character; he has sought and relished the give-and-take of political combat. This category of public figure, as much as any public official, will draw "the vehement, caustic, and sometimes unpleasantly sharp attacks" that create emotional distress. Philadelphia Newspapers, Inc. v. Hepps, --- U.S. ----, 106 S.Ct. 1558, 1561, 89 L.Ed.2d 783 (1986).
 
 
 14
 Because he stands on the same footing as a public official, Rev. Falwell was entitled to protect his reputation by bringing a libel suit and showing a false statement made with actual malice. Falwell did bring a libel suit, but he lost. The jury found in a special verdict that no one could reasonably have believed that the communication was presenting actual facts about anyone's personal life. Reputational damage to the Reverend Falwell was nil. Having failed to persuade the jury on the libel count, Falwell cannot then recover for emotional harm in the absence of reputational damage, for the constitutional principles of freedom of expression preclude attaching adverse consequences to utterances other than defamatory falsehoods. Garrison v. Louisiana, 379 U.S. 64, 73, 85 S.Ct. 209, 215, 13 L.Ed.2d 125 (1964); Greenbelt Co-op Pub. Ass'n v. Bresler, 398 U.S. 6, 10, 90 S.Ct. 1537, 1539, 26 L.Ed.2d 6 (1970).
 
 
 15
 An additional action for emotional distress does not belong in the hands of political figures. The tort began in a case where a woman suffered serious and permanent injuries after a practical "joker" told her to get two pillows to fetch her husband home because he was smashed up in an accident and had two broken legs. Wilkinson v. Downtown [1897] 2 Q.B.D. 57. In 1971, Dean Prosser was still able to write that "though the law appears to be moving in the direction of liability ... recovery is still limited to the most extreme cases of violent attack, where there is some especial likelihood of fright or shock, usually on the part of a woman." Prosser, Law of Torts (4th Ed. 1971). Though the tort of emotional distress has taken on new life in recent years, its extension to this case--to the very persons whose calling requires emotional strength and resiliency--is unwarranted. Indeed, to place the tort in the hands of political figures is to reject the rough-and-tumble that defines political life. In the political arena, "a certain toughness of the mental hide is a better protection than the law could ever be." Magruder, Mental and Emotional Disturbances in the Law of Torts, 49 Harv.L.Rev. 1033, 1035 (1936).
 
 II.
 
 16
 The jury in this case obviously did not believe that the communication was or purported to be a true disclosure about a public figure's personal life. Its verdict on the libel count demonstrates that the jury took this communication for what it was, namely a tasteless, silly, and scurrilous bit of nonsense. The panel opinion allows recovery because that communication strayed beyond the bounds of common decency. And, if decency were the only issue on appeal, there would be no disagreement.
 
 
 17
 The Supreme Court, however, has long recognized that "the most repulsive speech enjoys immunity" provided it does not violate those standards set forth in New York Times and its progeny. Letter Carriers v. Austin, 418 U.S. 264, 284, 94 S.Ct. 2770, 2781, 41 L.Ed.2d 745 (1974) (quoting Linn v. Plant Guard Workers, 383 U.S. 53, 63, 86 S.Ct. 657, 663, 15 L.Ed.2d 582 (1966)). The protections of the First Amendment do not turn upon the popularity or acceptability of that which is asserted. New York Times, 376 U.S. at 271, 84 S.Ct. at 721. Rather, our Constitution protects "even those opinions that we loathe and believe to be fraught with death." Roy, 401 U.S. at 275, 91 S.Ct. at 627 (quoting Abrams v. U.S., 250 U.S. 616, 630, 40 S.Ct. 17, 22, 63 L.Ed. 1173 (Holmes, J., dissenting)). In Roy, the Court emphasized that offensive speech may extend even to the personal attributes of political figures, especially those who offer themselves as moral examples:
 
 
 18
 The principal activity of a candidate in our political system ... consists in putting before the voters every conceivable aspect of his public and private life that he thinks may lead the electorate to gain a good impression of him. A candidate who, for example, seeks to further his cause through the prominent display of his wife and children can hardly argue that his qualities as a husband or father remain of "purely private" concern. And the candidate who vaunts his spotless record and sterling integrity cannot convincingly cry "Foul!" when an opponent or an industrious reporter attempts to demonstrate the contrary. Any test adequate to safeguard First Amendment guarantees in this area must go far beyond the customary meaning of the phrase "official conduct."
 
 
 19
 Monitor Patriot Co. v. Roy, 401 U.S. at 274, 91 S.Ct. at 626 (footnote omitted).
 
 
 20
 This does not suggest, however, that critics of public officials have carte blanche. Nor may they resort with impunity to the fig-leaf of an "Ad Parody--Not to be Taken Seriously." That label was applied to the Hustler "ad" in this case, and it did not and should not convey upon Flynt some magical immunity from suit. For example, if the communication were obscene, the parodist could certainly be prosecuted under the obscenity laws. Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973); New York v. Ferber, 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982). If the communication were found to be a false infliction of reputational harm, the publisher would be subject to a libel judgment. But one simply cannot subject a parody of a political figure to a cause of action for emotional distress.
 
 
 21
 The reason for this is obvious. Political satire and parody aim to distress. This genre of commentary depends upon distortion and discomfiture for its effect. The best political humor may be in bad taste. The cartoonist's nightmare may be that the intended victim of all his insult and ridicule indeed fails to suffer emotional distress, but instead finds the whole thing merely funny and calls up the cartoonist, not to complain, but to ask for the original. See Barnes, Lovebombing, The New Republic, October 13, 1986 at 12.
 
 III.
 
 22
 Nothing could be more threatening to the long tradition of satiric commentary than a cause of action on the part of politicians for emotional distress. Satire is particularly relevant to political debate because it tears down facades, deflates stuffed shirts, and unmasks hypocrisy. By cutting through the constraints imposed by pomp and ceremony, it is a form of irreverence as welcome as fresh air. While Hustler 's base parody is unworthy of this or any tradition, the precedent created by the cause of action against this defendant may one day come to stifle the finer forms of this genre.
 
 
 23
 The natural urge to bring down self-appointed moralists led Moliere to satirize the French lay clergy in Tartuffe, and motivated Mencken to chastise novelists for failing to look beneath the surface of American evangelists. Sinclair Lewis acted on Mencken's suggestion by writing Elmer Gantry, a scathing satiric attack on the Protestant clergy and the public's willingness to boost demagogues to positions of influence. E. Martin, H.L. Mencken and the Debunkers 123 (1984).
 
 
 24
 Public moralists have not been the only victims of the satirist's wit. Despite his enormous popularity in 1789, George Washington was once depicted on a donkey led by his aide David Humphreys over the caption, "The glorious time has come to pass/When David shall conduct an ass." S. Hess and M. Kaplan, The Ungentlemanly Art: A History of American Political Cartoons 61 (1968). Thomas Jefferson was forced to endure vicious rumors spread by general gossip as well as by his political enemies. For example, he was drawn as a lecherous beast who waited in his shirttails outside his wife's bedroom and as the keeper of a slave harem who auctioned his mulatto offspring into slavery. See V. Dabney, The Jefferson Scandals: A Rebuttal 9-15 (1981). Similarly, political cartoonists have portrayed Grover Cleveland as the father of an illegitimate child, pictured James Garfield as an unwed mother in a dress, and lambasted Ulysses S. Grant as an incompetent drunkard. See generally, Hess and Kaplan, supra; W. Murrell, A History of American Graphic Humor (1967).
 
 
 25
 William Charles, America's first widely acclaimed political cartoonist, found it expedient to leave Scotland in 1806 after he published an irreverent cartoon. The cartoon, "A Fallen Pillar of the Kirk," showed a clergyman bouncing a bare-bosomed young woman on his knee while exclaiming, "Oh Lord, what good things dost thou provide for us men!" Murrell, at 80. More recently, Gary Trudeau's Doonesbury has satirized the sanctuary movement of the liberation theologians and the Rev. Pat Robertson's direct line to divine inspiration.
 
 
 26
 These few examples illustrate the tradition of satiric comment. Much of the comment went overboard, and much would be considered libelous today. For all its clatter and hubbub, however, it has not undermined this country's profound respect for presidents and priests. But it has enhanced political debate. Nothing is more thoroughly democratic than to have the high-and-mighty lampooned and spoofed. An observant electorate may also gain by watching the reactions of objects of satiric comment, noting those who take themselves seriously and those whose self-perspective is somewhat more relaxed.
 
 IV.
 
 27
 The First Amendment relies on unfettered commerce in speech to regulate criticism of political figures. No matter how pernicious an opinion, "we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 504, 104 S.Ct. 1949, 1961, 80 L.Ed.2d 502 (1984) (quoting Gertz, 418 U.S. at 339-40, 94 S.Ct. at 3007). As Judge Learned Hand noted, the First Amendment "presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection. To many this is, and always will be, folly; but we have staked upon it our all." United States v. Associated Press, 52 F.Supp. 362, 372 (S.D.N.Y.1943) (quoted in New York Times, 376 U.S. at 270, 84 S.Ct. at 720). The panel's recognition of the tort of emotional distress now threatens to disrupt our historic reliance on this marketplace to regulate political speech.
 
 
 28
 A limited amount of regulation by law is allowed because the market cannot effectively regulate some forms of speech. New York Times recognized libelous statements made with actual malice as a permissible exception to the rule of the marketplace. The reason for this market exception is that "there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advance society's interest in 'uninhibited, robust, and wide-open' debate." Gertz, 418 U.S. at 340, 94 S.Ct. at 3007. Libelous statements not only fail to advance a societal interest; they actually impair the efficiency of the marketplace. If individuals could freely publish knowing or reckless falsehoods injurious to reputations, the market would be forced to view all factual statements with increased suspicion, a suspicion that would seriously impede the give-and-take of political discourse.
 
 
 29
 This rationale collapses with the tort of emotional distress. Here the market provides an efficient and effective way to dispatch outlandish comments which the First Amendment prefers to a regime of legal regulation. Speech such as the Hustler publication serves in the market only to discredit the speaker. It does not persuade, and it detracts not one whit from Rev. Falwell's reputation. Vicious and gratuitously personal attacks may well attract support and sympathy for their targets. Indeed, in this connection, the Ninth Circuit has ruled recently that Falwell's own distribution of the copyrighted Hustler ad for fund raising purposes was "fair use." Hustler Magazine, Inc. v. Moral Majority, Inc., 796 F.2d 1148 (9th Cir.1986).
 
 
 30
 The tort of emotional distress is more than just unnecessary to regulate political discourse; it will prove a profound and ominous inhibitor of speech. To recover under the tort, a political figure need show only the defendant's intention to publish something he should have known would cause emotional distress; conduct that offended the generally accepted standards of decency and morality; severe emotional distress; and a causal connection between the defendant's act and the emotional distress. Womack v. Eldrige, 215 Va. 338, 210 S.E.2d 145, 148 (1974). These elements encompass an absolutely staggering array of political statements, and there is no limiting principle in the panel opinion.
 
 
 31
 First and most importantly, the tort allows a political figure to recover for a perfectly true statement. This element strikes at the very heart of the First Amendment because, at a bare minimum, the Amendment must protect true speech about political figures. The Supreme Court has recently held that, if a statement deals with a matter of public concern, even a private figure cannot recover in a libel suit without showing its falsity. Philadelphia Newspapers, Inc. v. Hepps, 106 S.Ct. at 1559. If we now allow public figures to recover for true statements because of wounded sensibilities, we have entered a brave new world of First Amendment jurisprudence.
 
 
 32
 Second, the tort holds a defendant liable because he intended to cause emotional harm to a political figure. The Supreme Court has repeatedly stated that a defendant cannot be liable merely because he intended his statement to inflict harm. Beckley Newspapers Corp. v. Hanks, 389 U.S. 81, 88 S.Ct. 197, 19 L.Ed.2d 248 (1967); Garrison, 379 U.S. at 73, 85 S.Ct. at 215; New York Times, 367 U.S. at 279-80, 84 S.Ct. at 725-26. In a libel case, "instructions which permit a jury to impose liability on the basis of a defendant's hatred, spite, or ill will, or desire to injure are 'clearly impermissible.' " Letter Carriers, 418 U.S. at 281, 94 S.Ct. at 2780. Moreover, the Court has noted that, when a publisher criticizes a popular political figure, "it may be almost impossible to show freedom from ill will." Garrison, 379 U.S. at 74, 85 S.Ct. at 215. By conditioning liability on a simple showing of intent, the panel jettisons a wealth of First Amendment precedent.
 
 
 33
 Third, a plaintiff can so easily show that a defendant intended to publish the communication and that it caused emotional distress that liability under this tort becomes a matter of whether the communication offended generally accepted standards of decency and morality. This standard gives the jury almost unlimited discretion--more, for example, than the Supreme Court has permitted in the area of obscenity. Miller, 413 U.S. at 24, 93 S.Ct. at 2614. If the First Amendment protects only speech a jury finds to be generally acceptable, it serves no purpose. No one is sued for expressing pleasing sentiments. Either the First Amendment protects speech that makes someone uncomfortable, or it protects nothing. If the Amendment is to retain its full vitality, it cannot permit a public figure in the political arena to recover for emotionally upsetting speech.
 
 V.
 
 34
 Any panel holding with implications this far-reaching deserves the attention of the court en banc. The Supreme Court has made clear that recovery for political figures should be limited to the malicious infliction of defamatory falsehood. The possibility that controversial political figures could run to court and recover for emotional distress, when a jury has found no false statement of fact, no libel, and no reputational damage, undermines the First Amendment and its core purpose of protecting political debate. George Washington may have felt a lot worse--felt a lot more pure emotional distress--from Freneau's viciousness than has plaintiff here.* But what a tragedy it would have been had he choked things off at the foundation by winning a lawsuit for emotional distress.
 
 
 35
 HARRISON L. WINTER, Chief Judge, dissenting from the denial of rehearing in banc:
 
 
 36
 Because my participation in the case has not exposed me to the full adversarial process, I am not presently disposed to express any view on the correctness of the panel decision. But the eloquent dissent of Judge Wilkinson overwhelmingly demonstrates that this is a classic case for in banc consideration. It is a case involving the most fundamental freedom in a context of the greatest significance on which there is a dearth of authority. Why, when the court has freely granted rehearings in banc in recent years in many less significant cases, it declines to do so here, is inexplicable.
 
 
 37
 I, too, dissent from the denial of rehearing in banc.
 
 
 
 *
 Philip Freneau (1752-1832) earned the name of "poet of the American Revolution" by satirizing the British and Loyalists, and by commemorating the deeds of the American patriots. Not all of his barbs were aimed at the British, however. Washington was so aggravated by "that rascal Freneau" that he wished Secretary of State Jefferson to remove Freneau from his State Department position. Jefferson declined. Freneau was compelled to resign, however, after Jefferson's retirement. L. Leary, That Rascal Freneau, 233-36 (1941)