Kimerli Jayne **PRING**, Plaintiff-Appellee,

v.

**PENTHOUSE INTERNATIONAL, LTD.,
a New York corporation, and Philip
Cioffari, Defendants-Appellants.**

No. 81–1480.

United States Court of Appeals,
Tenth Circuit.

Nov. 5, 1982.

Rehearing Denied Jan. 11, 1983.

Thomas B. Kelley of Cooper & Kelley, P.C., Denver, Colo., Norman Roy Grutman of Grutman & Miller, New York City (Frank R. Kennedy of Cooper & Kelley, P.C., Denver, Colo., and Carmichael, McNiff & Patton, Cheyenne, Wyo., with them on brief), for defendants-appellants.

G.L. Spence of Spence, Moriarity & Schuster, Jackson, Wyo. (Edward P. Moriarity, Robert P. Schuster, and Robert N. Williams, Jackson, Wyo., with him on brief), for plaintiff-appellee.

R. Bruce Rich, New York City, filed a brief on behalf of amicus curiae Ass'n of American Publishers, Inc., Lauren W. Field and Yvette Miller of Weil, Gotshal & Manges, New York City, of counsel.

Jack C. Landau, Sharon P. Mahoney, and Clemens P. Work, Washington, D.C., filed a brief on behalf of amicus curiae Reporters Committee for Freedom of the Press.

Irwin Karp, New York City, filed a brief on behalf of amicus curiae The Authors League of America, Inc.

Before SETH, Chief Judge, and BREITENSTEIN and LOGAN, Circuit Judges.

SETH, Chief Judge.

This defamation case concerns an article which appeared in defendant's magazine *Penthouse.* It was written about a "Charlene," a Miss Wyoming at the Miss America contest and about the contest. The defendants argue that the story is a spoof of the contest, ridicule, an attempt to be humorous, "black humor," a complete fantasy which could not be taken literally.

The basic question which had to be resolved at the trial was in two parts—whether the publication was about the plaintiff, that is, whether it was of and concerning her as a matter of identity; and secondly, whether the story must reasonably be understood as describing actual facts or events about plaintiff or actual conduct of the plaintiff.

The first element, the matter of the relationship of the story to the plaintiff as a matter of identity, is well developed in the record and need not be discussed. The jury resolved the matter in Special Verdict Form # 2 and its position is supported by the record. This is a matter to be determined from the story as a whole. *See New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, and *Afro-American Publishing Co. v. Jaffe,* 366 F.2d 649 (D.C. Cir.).

The second element, that the story must reasonably be understood as describing actual facts about the plaintiff or her actual conduct, obviously is quite different from the first. In some opinions it is treated as part of the "of and concerning" requirement. It is really part of the basic ingredient of any defamation action; that is, a false representation of fact. In the case before us this requirement that the story must reasonably be understood to describe actual facts about the plaintiff has become the central issue.

■ The Supreme Court in *Letter Carriers v. Austin,* 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 held that a false representation of fact was required, but there "no such factual representation can reasonably be inferred." *Letter Carriers,* of course, had the added ingredient of a labor dispute, but this does not remove the factual statement requirement. In *Letter Carriers* the Court stated: "Before the test of reckless or knowing falsity can be met, there must be a false statement of fact," citing *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789. This factual statement and "reasonably understood" element is described by the Supreme Court as a constitutional requirement. It is, of course, a basic part of the First Amendment-defamation interaction.

In *Greenbelt Pub. Assn. v. Bresler,* 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6, the Court considered a newspaper story which referred to the position the plaintiff had taken on matters before the city council as "blackmail." The stories the paper carried were full and accurate. The "blackmail" characterization was made by a speaker at the council meetings. Plaintiff had property the city wanted to buy and plaintiff had other property he wanted to have rezoned. Discussions with the city on both matters were proceeding concurrently. The trial court and the Maryland Court of Appeals viewed the use of the word as charging the crime of blackmail, and since the paper knew plaintiff had committed no such crime it would be held liable for the "knowing use of falsehood." As to this theory the Su-

preme Court said, "[W]e hold that the imposition of liability on such a basis was constitutionally impermissible—that as a matter of constitutional law, the word 'blackmail' in these circumstances was ... not libel." The Court as a reason for its holding stated in substance that no one could take the word literally and that it referred to plaintiff's "bargaining position." The Court said:

"No reader could have thought that either the speakers at the meetings or the newspaper articles reporting their words were charging Bresler with the commission of a criminal offense. On the contrary, even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who consider Bresler's negotiating position extremely unreasonable. Indeed, the record is completely devoid of evidence that anyone in the city of Greenbelt or anywhere else thought Bresler had been charged with a crime.

"To permit the infliction of financial liability upon the petitioners for publishing these two news articles would subvert the most fundamental meaning of a free press, protected by the First and Fourteenth Amendments." (Footnote omitted.)

See also *Letter Carriers v. Austin,* 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745.

In *Letter Carriers,* referred to briefly above, the publication included a list of names of persons who had not joined the union. It described them as "scabs" and provided a derogatory description of what a scab was, including "a traitor to his God, his country." The Court made the "statement of fact" requirement, and in substance held that the statements could not be taken literally and no factual representation was present. See also *Myers v. Boston Magazine Co., Inc.,* 380 Mass. 336, 403 N.E.2d 376 (1980).

The article had its setting at a Miss America contest and described Charlene, a Miss Wyoming at the contest, who was a baton twirler. The article began with a

description of Charlene with other contestants at a bar during the course of the contest. It quotes a conversation between Charlene and her coach, a man referred to as Corky. The story then switches to the contest as Charlene is about to perform her talent as a baton twirler. She is about to go on stage and her thoughts are described. She thinks of Wyoming and an incident there when she was with a football player from her school. It describes an act of fellatio whereby she causes him to levitate. The story returns to the Miss America stage where she goes on to perform her talent. She there performs a fellatio-like act on her baton which stops the orchestra. The act is concluded and the conversation between Charlene and her coach is described, and conversation with other contestants. She did not reach the finals but she says or thinks she has a "real talent." The third incident is then described. She is at the edge of the stage during the finals while the finalists are at center stage and the finals are under way. Charlene's thoughts are again described and these are how she would have answered the questions put to the finalists had she been one. These thoughts were that she would "save the world" with her real talent with the "entire Soviet Central Committee to prevent a Third World War? Marshall Tito? Fidel Castro?" She would be the ambassador of love and peace. The article then describes an act of fellatio with her coach at the edge of the stage while the audience was applauding the new Miss America in center stage. This fellatio causes the levitation of her coach. It is described that the television cameras were not on the new Miss America but "remained" on Charlene and her coach who was then rising into the air, and the story ends.

The complaint, as amended, refers to these incidents and limits the consequences to:

"The net effect of the aforementioned article was to create the impression throughout the United States, Wyoming and the world that the Plaintiff committed fellatio on one Monty Applewhite and also upon her coach, Corky Corcoran, in the presence of a national television audience at the Miss America Pageant. The article also creates the impression that Plaintiff committed fellatio like acts upon her baton at the Miss America contest."

Plaintiff by her amendment of her complaint to avoid answering interrogatories, as mentioned above, narrowed her cause to the three incidents and limited them to the descriptions with no general implications. This had three consequences: the trial court limited defendants as to what they could question plaintiff about—no sex history; prevented plaintiff from any use of general imputations of immorality; and caused a reliance on the particular descriptions.

The author of the article was the defendant Cioffari, a PhD who was a professor of English at a university in New Jersey.

As described, *Greenbelt* concerned a factual newspaper account with the word "blackmail" in that context. Here, the underlying event described was the Miss America Pageant, but it was readily apparent, with the extended description of thoughts of Charlene and other indications, that it was all fanciful and did not purport to be a factual account. In this context there are the particular three incidents which are in themselves fantasy and present levitation as the central theme and as a device to "save the world." We have impossibility and fantasy within a fanciful story. Also of significance is the fact that some of the incidents were described as being on national television and apparently before the audience at the pageant or part of the audience. This in itself would seem to provide a sufficient signal that the story could not be taken literally, and the portions charged as defamatory could not reasonably be understood as a statement of fact. Again, as the Court said in *Greenbelt:* "It is simply impossible to believe that a reader who reached the word 'blackmail' in either article would not have understood exactly what was meant."

The witnesses from the community who appeared for the plaintiff *all* testified that the story could not possibly be about her as

she would not do that. The plaintiff asserted, and the trial court concluded, that the descriptions be taken literally. The Court said in *Greenbelt:* "The imposition of liability on such a basis was constitutionally impermissible." The "blackmail" there and the three incidents described in the publication here concerned must be regarded in the same way. Neither is to be taken literally and neither could reasonably be considered a statement of fact.

It would serve no useful purpose to treat separately the "false light" cause of action nor the "outrageous conduct" doctrine sought to be injected into the trial, as the same First Amendment considerations must be applied.

■ The test is not whether the story is or is not characterized as "fiction," "humor," or anything else in the publication, but whether the charged portions in context could be reasonably understood as describing actual facts about the plaintiff or actual events in which she participated. If it could not be so understood, the charged portions could not be taken literally. This is clearly the message in *Greenbelt* and *Letter Carriers.* The plaintiff urges that this constitutional doctrine should apply only to public figures, but there is no such limitation and the disposition of the several cases considered above so demonstrates. The court in *Bindrim v. Mitchell,* 92 Cal. App.3d 61, 155 Cal.Rptr. 29, which is discussed by both parties, considers this issue also. *See also Bucher v. Roberts,* 198 Colo. 1, 595 P.2d 239 (1979); and *Myers v. Boston Magazine Co., Inc.,* 380 Mass. 336, 403 N.E.2d 376 (1980).

The trial court submitted to the jury only the question of identity. It refused to submit the "reasonably understood" issue although instructions were tendered. The instruction given, No. 16, in part, states:

"The magazine piece in issue does not name the Plaintiff. In order to recover, therefore, the Plaintiff must show by a preponderance of the evidence that the writing was published of and concerned her.

"In order so to find, you must determine that the article was intended to refer to the Plaintiff and that it is reasonably probable that members of the public who read the article would understand it was referring to her. A libel may be published of an actual person by a story that is intended to deal with fictitious characters, if the characters or plot bear such resemblance to actual persons and events as to make it reasonable for its readers or audience to understand that a particular character is intended to portray that person."

The special verdict contains the same standards. This is as close as the trial court came to instructing on the "reasonably understood" matter and it is apparent that the instruction is only a matter of identifying the plaintiff, and has no other element. The jury found that plaintiff was the person "referred to"—it was about her.

■ It appears that the trial court had decided the story generally was not fiction in its ruling on the pretrial motion to dismiss, and that this disposed of the matter. The trial court thus treated the whole story as a statement of fact as the trial court did in *Greenbelt.* This was error. The Supreme Court in *Greenbelt,* under comparable circumstances, held that to give a literal meaning to the word there concerned was "constitutionally impermissible." The Court in the circumstances before it in *Greenbelt* thus treated the "reasonably understood" element as a question of law: "It is simply impossible to believe that a reader . . . would not have understood exactly what was meant."

The first inclination is to hold that the issue described above should have been submitted to the jury. It is apparent that an argument can be built on the word "reasonably" as a typical element for a jury, and in some circumstances it could be a jury question. Justice White in his concurrence in *Greenbelt* suggests that it was there a jury question. The majority, however, regarded it as a matter of law.

■ All the testimony from plaintiff's lay witnesses was that it could not be about

the plaintiff. An "expert" witness testified that some individuals might attach a broader subliminal meaning of sexual permissiveness, but this does not represent an applicable standard and cannot be regarded as much more than a contradiction of the testimony of her witnesses.

The charged portions of the story described something physically impossible in an impossible setting. In these circumstances we must reach the same conclusion, as did the Court in *Greenbelt,* that it is simply impossible to believe that a reader would not have understood that the charged portions were pure fantasy and nothing else. It is impossible to believe that anyone could understand that levitation could be accomplished by oral sex before a national television audience or anywhere else. The incidents charged were impossible. The setting was impossible.

This does not leave, on the record before us, any alternative but to decide as a matter of law, as was said in *Greenbelt,* "even the most careless reader must have perceived that." The descriptions were "no more than rhetorical hyperbole." Here, they were obviously a complete fantasy.

■ The story is a gross, unpleasant, crude, distorted attempt to ridicule the Miss America contest and contestants. It has no redeeming features whatever. There is no accounting for the vast divergence in views and ideas. However, the First Amendment was intended to cover them all. The First Amendment is not limited to ideas, statements, or positions which are accepted; which are not outrageous; which are decent and popular; which are constructive or have some redeeming element; or which do not deviate from community standards and norms; or which are within prevailing religious or moral standards. Although a story may be repugnant in the extreme to an ordinary reader, and we have encountered no difficulty in placing this story in such a category, the typical standards and doctrines under the First Amendment must nevertheless be applied. The magazine itself should not have been tried for its moral standards. Again, no matter how great its

divergence may seem from prevailing standards, this does not prevent the application of the First Amendment. The First Amendment standards are not adjusted to a particular type of publication or particular subject matter.

The Supreme Court considered what it described as "vulgar magazines" in *Winters v. New York,* 333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840, and held that despite all the disparate views they were within the protection of the First Amendment. The gross nature of the article here concerned makes an objective analysis of the law difficult, but we do not make a moral judgment as to this magazine, or other writings of the author, nor on the article generally as plaintiff urges by her brief.

The judgment must be reversed with directions to set aside the verdict of the jury and to dismiss the action.

IT IS SO ORDERED.

BREITENSTEIN, Circuit Judge, dissenting.

The majority holds that as a matter of law this defamation action must be dismissed because the publication was pure fantasy protected by the First Amendment. I do not agree.

On overwhelming evidence the jury found that the plaintiff Pring was the "Miss Wyoming" about whom the Penthouse article was written. The majority accept that jury finding. The question is whether Penthouse can escape liability by the claim that the article was fiction and fantasy.

The article contains both fact and fiction. The article says that Miss Wyoming performed fellatio with a male companion and caused him to levitate. In her appearance at a national Miss America contest she thought that she might save the world by similar conduct with high officials. She manipulated her baton so as to simulate fellatio. She performed fellatio with her coach in view of television cameras. I consider levitation, dreams, and public performance as fiction. Fellatio is not. It is a

physical act, a fact, not a mental idea. Fellatio has long been recognized as an act of sexual deviation or perversion. Numerous decisions place fellatio within the crime of sodomy, which civilized people throughout the world have long condemned. In *Hunt v. State of Oklahoma,* 10 Cir., 683 F.2d 1305, a conviction for sale of a movie "graphically depicting a woman performing fellatio" Id. at 1307, was affirmed. The statements in the Penthouse article that Miss Wyoming, identified by the jury as plaintiff Pring, engaged in acts of sexual deviation and perversion, is a defamation of character which no decision of which I am aware has placed within First Amendment protection.

Penthouse cannot escape liability by relying on the fantasy used to embellish the fact. Penthouse did not present the article as fiction. It did not make the usual disclaimer of reference to no person living or dead. In the table of contents, the article is characterized as "Humor." Responsibility for an irresponsible and reckless statement of fact, fellatio, may not be avoided by the gratuitous addition of fantasy. Penthouse does not claim that the fact statement was truthful. Moral standards may have changed since the First Amendment was adopted but that change has not gone so far as to protect a publisher which defames an identifiable living person by relating commission of an act of sexual deviation and perversion.

To justify the conclusion that the First Amendment defense presents a question of law, the majority adopt the "reasonably understood" test. To support that test reference is made to *Greenbelt Pub. Assn. v. Bresler,* 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6, and *Letter Carriers Assn. v. Austin,* 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745. *Bresler* involved a newspaper report of a public meeting held by a City Council. The article truthfully reported that a person present at the meeting characterized the plaintiff's negotiating position as "blackmail." In reversing a judgment for plaintiff, the Court said that the publication did not impute a crime and that even the most careless reader would perceive that the word "blackmail" was no more than a "rhe-

torical hyperbole, a vigorous epithet." 398 U.S. at 14, 90 S.Ct. at 1542.

*Letter Carriers* was a defamation action arising out of a labor dispute in which a union publication referred to plaintiffs as "scabs" and equated "scab" with "traitor." In reversing a judgment for plaintiffs, the Court applied law relating to labor disputes and said, 418 U.S. at 283, 94 S.Ct. at 2780: "Rather than being a reckless and knowing falsehood, naming the appellees as scabs was literally and factually true."

In both *Greenbelt* and *Letter Carriers* the alleged defamatory statement was true. Penthouse makes no claim that the act of fellatio by Miss Wyoming was true. The word "fellatio" was not used as an hyperbole or epithet. It was used to describe a physical act. The use of the technical Latin term rather than the vulgar vernacular does not protect Penthouse. The descriptions of the conduct of Miss Wyoming would make even the most careless reader aware of sexual deviation and perversion. The jury found that a "reasonable man" would understand that the plaintiff was the person referred to in the article, that the article was false and defamatory, and that it "unreasonably" placed the plaintiff in a false light before the public. See Jury Verdict, R. 1500–1503.

Nothing in *Greenbelt* or *Letter Carriers* applies a "reasonably understood" test to defamation actions generally. In each of those cases the alleged defamatory statement was literally true. Here it was not.

The action of the majority in applying the "reasonably understood" test as a matter of law contravenes the Tenth Circuit decision in *Lawrence v. Moss,* 10 Cir., 639 F.2d 634, cert. denied 451 U.S. 1031, 101 S.Ct. 3021, 69 L.Ed.2d 400. The *Lawrence* decision cites and analyzes Supreme Court cases with facts more analagous to the present case than either *Greenbelt* or *Letter Carriers*. Id. at 636–637. I stand by that analysis. *Lawrence* reversed a summary judgment for defendant, directed that a jury trial be held, Id. at 638–639, and said that questions of intent and malice

are for the fact finder. Id. So also is the question of "reasonably understood." I recognize, as does *Lawrence,* that in some defamation cases brought against news media summary judgment may be proper as a screening device to prevent unnecessary harassment. Id. at 639. That principle does not apply here. The district court properly submitted the case to the jury.

The majority reject the jury verdict and order dismissal because, as a matter of law, the article is not defamatory. I disagree and, accordingly, dissent. The majority order of dismissal makes it unnecessary to consider the many other issues raised in the briefs.