**Andrea DWORKIN, Plaintiff,**

v.

**HUSTLER MAGAZINE, INC., etc., et al., Defendants.**

**No. CV 86–7768 AWT.**

United States District Court, C.D. California.

Aug. 25, 1987.

Gerald L. Spence, Gary L. Shockey, Elizabeth Greenwood, Spence, Moriarity & Schuster, Jackson, Wyo., for plaintiff.

Alan L. Isaacman, David O. Carson, Kirk N. Sullivan, Cooper, Epstein & Hurewitz, Beverly Hills, Cal., for defendants.

## MEMORANDUM OPINION AND ORDER

TASHIMA, District Judge.

### I. PROCEDURAL AND FACTUAL BACKGROUND

Plaintiff Andrea Dworkin ("Dworkin") is an author and lecturer who is an active member of the feminist antipornography movement. Dworkin and two members of the Wyoming Chapter of the National Organization for Women ("NOW") filed this action in Wyoming state court against Hustler Magazine, Inc. (for simplicity's sake, both the corporate defendant and the magazine are referred to collectively as "Hustler"), its publisher Larry Flynt ("Flynt"), his corporation, Flynt Distributing Company, Inc., Inland Empire Periodicals, the regional distributor of Hustler, and Park Place Market, a retail store that sold Hustler. All plaintiffs asserted claims for violation of and interference with their constitutional rights under the First and Fourteenth Amendments to the Constitution, joint and several liability and violation of Wyoming's obscenity statutes. In addition, Dworkin sued for intentional infliction of emotional injury, libel, invasion of privacy and "outrage."

The action arose from three items, designated (and hereafter referred to) as Exhibits A, B and C, that were published in the February, March and December 1984, issues, respectively, of Hustler. Proper analysis of the issues in this case requires that these exhibits be described in some detail.

Exhibit A is a cartoon that portrays two women apparently engaging in cunnilingus. One woman says to the other, "You remind me so much of Andrea Dworkin, Edna. It's a dog-eat-dog world."

Exhibit B is a sequence of photographs accompanied by captions that appear in comic-book style graphics. It is entitled, "SO MANY DYKES—SO LITTLE TIME. DIRECTED BY AL GOLDSTEIN." The initial photographs show women picketing outside a building labelled "Al's Bimbo Bar," with signs protesting pornography. As the photo-sequence progresses, it shows a man addressing the camera while he is attacked by the protesters. He begins by saying, "In my fantasy I'm a quiet, sensitive, misunderstood Jewish pimp for sore-covered, starving children from Haiti." The subsequent photos show the man and several of the women engaged in various sex acts with various partners. The captions are written in the first person. The male narrator describes the events six times as his "fantasy."

The reference to Dworkin appears on the top of the fourth page, where the caption states, "While I'm teaching this little shiksa the joys of Yiddish, the Andrea Dworkin Fan Club begins some really *serious* suck 'n' squat. Ready to give up holy wafers for matzoh yet, guys?" (Emphasis in original.) The photos below the caption depict women engaged in cunnilingus with one another. Toward the conclusion of the photo-sequence, a woman identified as "Field Marshal Steinem" arrives. The woman is carrying a book by Gloria Steinem, the well-known feminist, and, to this viewer, resembles her physically. In the final photos, the women attack "Field Marshal Steinem" in a violent sexual assault scene. In the final photo, the man in the photo-sequence, who is the narrator, is clearly identified as the "director" Al Goldstein as he faces the camera and says, "I'll do anything for $10,000—which is what Flynt paid me to take my nose (and finger) out of his behind and direct this fantasy."

Exhibit C is entitled "Porn from the Past" (apparently, a regular feature of Hustler). It portrays a man performing cunnilingus on a woman while he masterbates. The caption reads:

> We don't believe it for a minute, but one of our editors swears that this woman in the throes of ecstasy is the mother of radical feminist Andrea Dworkin. He's also positive that the guy performing "Babaloo" on Mama's drums while keeping time with his stick is Robby "the Rock" Ricardo—a distant relative of *I Love Lucy*'s Ricky. Understandably, we gave that editor the day off to watch *Leave It to Beaver* reruns.

Defendants removed this action from state court to the United States District Court for the District of Wyoming (the "Wyoming federal court"). *See Dworkin v. Hustler Magazine, Inc.*, 611 F.Supp. 781 (D.Wyo.1985) (denying plaintiffs' motion for remand) (*"Dworkin I"*). The Wyoming federal court dismissed all of the claims under the Constitution and the Wyoming statutes, the only claims asserted by the Wyoming members of NOW. Thus, all plaintiffs, except Dworkin, were dismissed from the case. The Wyoming federal court

also dismissed all claims against Inland Empire Periodicals and Park Place Market. *Dworkin v. Hustler Magazine, Inc.*, 634 F.Supp. 727, 731 (D.Wyo.1986) (*"Dworkin II"*). Subsequently, acting under the compulsion of a writ of mandamus, *Hustler Magazine, Inc. v. United States District Court*, 790 F.2d 69 (10th Cir.1986), the Wyoming federal court reluctantly granted defendants' motion under 28 U.S.C. § 1404(a) for change of venue to this district. *Dworkin v. Hustler Magazine, Inc.*, 647 F.Supp. 1278, 1283 (D.Wyo.1986) (*"Dworkin III"*). As explained below, the Court takes the case as the case comes to it and accepts as the law of the case the rulings made by the Wyoming federal court.

Before this Court is the motion of Hustler, Flynt and Flynt Distributing Company, the only remaining defendants ("defendants"), for summary judgment on the claims of libel, invasion of privacy, intentional infliction of emotional injury and "outrage" of Dworkin, the sole remaining plaintiff. This court has jurisdiction under 28 U.S.C. § 1332. Venue is proper under 28 U.S.C. § 1391(a) and § 1404(a).

## II. DISCUSSION

Under F.R.Civ.P. 56(c), summary judgment is appropriate if "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." In a recent opinion, Judge Sneed aptly summarized the non-moving party's burden to withstand a motion for summary judgment under recent, and controlling, Supreme Court case law:

> First, the Court has made clear that if the non-moving party will bear the burden of proof at trial as to an element essential to its case, and that party fails to make a showing sufficient to establish a genuine dispute of fact with respect to the existence of that element, then summary judgment is appropriate. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Second, to withstand a motion for summary judgment, the non-moving party must show that there are "genuine factual issues that properly can be re-

solved only by a finder of fact *because they may reasonably be resolved in favor of either party."* *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (emphasis added). Finally, if the factual context makes the non-moving party's claim *implausible,* that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). *California Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.,* 818 F.2d 1466, 1468 (9th Cir.1987) (emphasis in original). However, it remains the rule that "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Anderson,* 106 S.Ct. at 2513.

### A. Choice of Law

■ In diversity cases, the federal courts must look to the forum state's conflict of laws rules to determine the applicable substantive law. *Klaxon v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Where, as here, an action has been transferred, the transferee court must apply the same law that the transferor court would apply. *Van Dusen v. Barrack,* 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964).

■ The Wyoming federal court held that a Wyoming state court faced with an interstate tort case, with elements in different jurisdictions, would apply the law of the state in which the cause of action arose. *See Dworkin III,* 647 F.Supp. at 1281 (citing *Duke v. Housen,* 589 P.2d 334, 335 (Wyo.), *cert. denied,* 444 U.S. 863, 100 S.Ct. 132, 62 L.Ed.2d 86 (1979). Although the Wyoming Supreme Court has not ruled on this particular choice of law issue, the Wyoming federal court held that in a case of multistate defamation, a Wyoming state court would hold that the cause of action arose in the state of the plaintiff's domicile, in this case, New York. *Id.* at 1281–82.[1] That holding, that the defamation claim is governed by New York law, is the law of the case. *See United States v. Mills,* 810 F.2d 907, 909 (9th Cir.1987) ("in order to maintain consistency during the course of a single case, reconsideration of questions previously decided should be avoided").

The Wyoming federal court did not discuss the law applicable to the claims for invasion of privacy, intentional infliction of emotional injury and outrage, but it is fairly clear that the law of New York, Dworkin's domicile, would also apply to these claims. *See* Restatement (Second) of Conflict of Laws §§ 145, 153. This inquiry, however, need not detain us because, as will be demonstrated below, the outcome of this motion would be the same no matter which state's law is applied,[2] especially since defendants claim First Amendment protection for the material in dispute, which is a matter of federal constitutional law in diversity cases. *See Koch v. Goldway,* 817 F.2d 507, 508–09 (9th Cir.1987) (*"Koch II"*).

---

1. The Wyoming federal court noted that in conflict of laws matters, Wyoming normally follows the First Restatement of Conflict of Laws. *Dworkin III,* 647 F.Supp. at 1281 (citing *Duke,* 589 P.2d at 341). According to the Restatement of Conflict of Laws § 377, Comment 5, the place of injury in a defamation action is the place where the information is communicated and the plaintiff is known, which is usually the plaintiff's domicile. Restatement (Second) of Conflict of Laws § 150(2) is in accord. The Wyoming federal court noted that the Tenth Circuit also has held, on somewhat different reasoning, that Wyoming would apply the law of the plaintiff's domicile in a multistate defamation case. *Id.* at 1281–82. *See Anselmi v. The Denver Post, Inc.,* 552 F.2d 316 (10th Cir.1977).

2. Dworkin argues that *Keeton v. Hustler Magazine, Inc.* 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984), held that the substantive law of the forum applies in a libel action brought on the basis of diversity jurisdiction. *Keeton* does not stand for this proposition. The Court in *Keeton* expressly pointed out that it was *not* deciding whether the forum state's law applied; it reached only the issue of whether that court had personal jurisdiction over defendants. *Id.* at 778, 104 S.Ct. at 1480. The Court emphasized that the choice of law question arises "only after jurisdiction over respondent is established." *Id.*

## B. *Defamatory Meaning*

Defendants claim that the exhibits at issue here are not actionable as a matter of law because, as clear fiction or fantasy and humor, they are not reasonably susceptible of a defamatory meaning.

Courts have taken different analytical approaches to this issue. A recent New York decision appears to treat this as an issue arising from state defamation law. *See Frank v. National Broadcasting Co.,* 119 A.D.2d 252, 506 N.Y.S.2d 869, 872–73 (1986), *appeal granted,* 69 N.Y.2d 607, 507 N.E.2d 320 (1987). In *Frank* the court held that statements made during a televised comedy skit in which a performer, purporting to be a tax consultant with the same name as the plaintiff, a tax accountant, were "so extremely nonsensical and silly" that there was no possibility that any person could take them seriously and, thus, were not actionable.[3] *Frank,* 506 N.Y.S.2d at 875. The court noted that a California court recently had used a similar standard, citing *Polygram Records, Inc. v. Superior Court,* 170 Cal.App.3d 543, 216 Cal.Rptr. 252 (1985).

The court in *Polygram Records,* relying on both the California and federal Constitutions, held that a comedian's statements that a wine, with the same name as plaintiff's product, was a black wine, a "motherfucker," tasted like urine and went with "any damn thing it wants to," were not defamatory as a matter of law where the content and context made it obvious that no sensible person could take them seriously. *Id.* at 547, 556–57, 216 Cal.Rptr. 252. The court noted that "to hold otherwise would run afoul of the First Amendment and chill the free speech rights of all comedy performers and humorists, to the genuine detriment of our society." [4] *Id. See also Fisher v. Dees,* 794 F.2d 432, 440 (9th Cir. 1986) (following *Polygram Records* as a matter of state law in holding that song parody with allegedly "obscene, indecent and offensive words" could not, as a matter of law, "reasonably be understood in a defamatory sense" by those who heard it).

The Supreme Court raised the requirement that a statement be reasonably susceptible of a defamatory meaning to be actionable to constitutional status in *Greenbelt Coop. Publishers Ass'n v. Bresler,* 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970). The Court held, relying on the First and Fourteenth Amendments, that the use of the term "blackmail" in characterizing the negotiating position of a public figure who spoke at a heated public meeting of the city council was not defamatory as a matter of law because no reasonable reader could have understood the term as charging the plaintiff with the criminal offense of blackmail. *Id.* at 13–14, 90 S.Ct. at 1541. Justice Stewart explained, "even the most careless reader must have perceived that the word [blackmail] was no more than rhetorical hyperbole, a vigorous epithet used by those who considered Bresler's negotiating position extremely unreasonable." *Id.* at 14, 90 S.Ct. at 1542.

The Supreme Court relied on *Greenbelt* in *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin,* 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974).[5] There, the publication at issue was a union newspaper that contained a list of names of persons who had not joined the

---

**3.** The *Frank* court stated that "The principal factors distinguishing humorous remarks that are defamatory from those that are not appear to be whether the statements were intended to injure as well as amuse and whether they give rise to an impression that they are true." 506 N.Y.S.2d at 873 (citing *Triggs v. Sun Printing & Publishing Ass'n,* 179 N.Y. 144, 71 N.E. 739 (1904)). In light of the conclusion that the statements in issue here cannot reasonably "give rise to an impression that they are true," it is unnecessary to reach the issue of whether they were intended to injure.

**4.** However, the courts in both *Frank* and *Polygram Records* made it clear that they were not ruling that comedy is *per se* immune from a defamation action. *See Frank,* 506 N.Y.S.2d at 875; *Polygram Records,* 170 Cal.App.3d at 552–53, 216 Cal.Rptr. 252.

**5.** In *Letter Carriers,* the Court based its decision not on the First Amendment, but rather on the protection that the federal labor laws extend to communications made in the course of a labor dispute. *See* 418 U.S. at 283 n. 15, 94 S.Ct. at 2781 n. 15. However, the Court relied heavily on the First Amendment defamation cases. *See id.* at 282–86, 94 S.Ct. at 2780–82.

union, labelling them as "scabs" and added author Jack London's derogatory description of a scab, including the statement that "a SCAB is a traitor to his God, his country, his family and his class." The Court held, by analogizing to *Greenbelt,* that it was impossible to believe that any reader of the paper would have understood it to be charging the nonunion members with the criminal offense of treason. *Id.* at 285, 94 S.Ct. at 2781. The Court reasoned that London's "definition" was "merely rhetorical hyperbole, a lusty and imaginative expression of the contempt felt by union members towards those who refuse to join." *Id.* at 286, 94 S.Ct. at 2782. However, the Court warned that similar language could be actionable, "if some of its words were taken out of context and used in such a way as to convey a false representation of fact," but the Court held that in the case at bar "no such factual representation can reasonably be inferred...." *Id.*

The Tenth Circuit followed the approach of *Greenbelt* and *Letter Carriers* in *Pring v. Penthouse Int'l, Ltd.,* 695 F.2d 438 (10th Cir.1982), *cert. denied,* 462 U.S. 1132, 103 S.Ct. 3112, 77 L.Ed.2d 1367 (1983). There plaintiff, a former "Miss Wyoming," sued Penthouse Magazine based on a story it published in which Miss Wyoming engaged in sexual acts with her coach that caused

him to levitate on stage during the Miss America Pageant. The court held that no reasonable reader could have "reasonably understood" this story as "describing actual facts about the plaintiff or actual events in which she participated." *Id.* at 442–43.

The district court in *Koch v. Goldway,* 607 F.Supp. 223 (C.D.Cal.1984) (*"Koch I"*), *aff'd,* 817 F.2d 507 (9th Cir.1987), held that the following statement was not actionable: "There was a well-known Nazi criminal named Ilse Koch during World War II. Like Hitler, Ilse Koch was never found. Is this the same Ilse Koch? Who knows?" *Id.* at 224. The court stated as one of two grounds for its decision, that this statement could not reasonably be understood to describe actual facts about the plaintiff because of the age disparity that would exist between the plaintiff and any Nazi war criminal and the unlikelihood that such a criminal would retain her name and plunge herself into politics. *Id.* at 226 (citing *Greenbelt,* 398 U.S. 6, 90 S.Ct. 1537; *Pring,* 695 F.2d 438). As an alternative ground, the court ruled that this was a statement of opinion rather than fact and was thus constitutionally protected. *Id.* at 225 (citing *Gertz v. Robert Welch,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974)).[6]

*Koch I* was affirmed by the Ninth Circuit, but it conflated the two rationales into one.[7] *See Koch II,* 817 F.2d 507. The

**6.** In a well-known passage, the Court in *Gertz* began its discussion of the case stating:

Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in "uninhibited, robust, and wide-open debate on the public issues."

*Gertz,* 418 U.S. at 339–40, 94 S.Ct. at 3007 (quoting *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)). Although these statements are *dicta,* a clear majority of the circuits have accepted them as controlling law. *Ollman v. Evans,* 750 F.2d 970, 974–75 n. 6 (D.C.Cir.1984) (collecting cases), *cert. denied,* 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985). Those courts have interpreted *Gertz* as raising the distinction between fact and opinion to a constitutional principle. *See id.* at 975; *Lewis v. Time, Inc.,* 710 F.2d 549, 552–53 (9th

Cir.1983). Thus, courts have held that expressions of opinion are protected by the First Amendment "because there is no such thing as a 'false' opinion." *Ollman,* 750 F.2d at 976. *See also Lewis,* 710 F.2d at 553; *Mr. Chow v. Ste. Jour Azur S.A.,* 759 F.2d 219, 223 (2d Cir.1985). The issue of whether a statement is one of fact or opinion is a question of law. *See Lewis,* 710 F.2d at 553; *Mr. Chow,* 759 F.2d at 224.

**7.** The court in *Polygram Records,* thought that the issue of whether a statement is susceptible of a defamatory meaning was analogous to the issue of whether the statement is one of fact or opinion, but that they were separate issues. 170 Cal.App.3d at 551 n. 8, 216 Cal.Rptr. 252. The court declined to consider whether the statements at issue there were constitutionally protected opinions. *Id.* at 557 n. 20, 216 Cal.Rptr. 252. The district court in *Koch I* also thought these were separate issues since it stated them as alternative holdings. *See* 607 F.Supp. at 225–26.

Ninth Circuit defined the issue as "whether the statement recites or implies factual matters that are defamatory, or ... whether it is opinion only and so not defamatory at all." *Id.* at 508. However, the court's analysis indicates that it found that these statements could not *reasonably be understood* as describing actual facts about Koch. The court stated, "It is unreasonable to construe the remarks to say or imply that the plaintiff is in fact Ilse Koch the war criminal, for no one would be so credulous as to conclude that a war criminal on the run would use her true name and project herself in public debate." *Id.* at 509. The court looked to the circumstances surrounding the making of the statement. Koch and the plaintiff had been engaged in an ongoing and heated political debate over the appropriateness of rent control. The court found that these considerations "give rise to the inference that the remark was intended and understood not as a statement of fact but as a slur against a political opponent." *Id. See also id.* at 510 (citing *Greenbelt*, 398 U.S. 6, 90 S.Ct. 1537; *Pring*, 695 F.2d 438.) The court concluded by suggesting that all statements that are not factual must be categorized as opinion, stating, "We find no factual assertions in the remarks and, as a matter of law, they must be classified as opinion, nothing more." *Id. See also id.* at 509 (defining "opinion" as "[s]tatements not themselves factual, and which do not suggest that a conclusion is being drawn from facts not disclosed in the statement").

Whether one frames the issue in terms of the "reasonably understood" requirement or the "fact/opinion" dichotomy, several points emerge from the cases discussed above. As both a matter of state defamation law and constitutional protection, the exhibits at issue must convey to a reasonable reader the impression that they describe actual *facts* about the plaintiff or activities in which she participated to be actionable. When one cannot reasonably interpret the material as portraying actual facts about the plaintiff, no damage to reputation can result. *Koch I*, 607 F.Supp. at 226. It is for the court to decide this issue in the first instance as a matter of law. *Frank*, 506 N.Y.S.2d at 872; *Polygram Records*, 170 Cal.App.3d at 551, 216 Cal.Rptr. 252; *Pring*, 695 F.2d at 442. While the cases discussed above provide no bright-line "test", they do provide a variety of analytical tools to aid in determining whether a statement is one of fact or something else, such as opinion, rhetorical hyperbole or pure fantasy.[8]

Exhibit A is a cartoon. Although cartoons are not exempt from the law of defamation, it is important to consider the immediate context in which the statement was made. *See Information Control*, 611 F.2d at 784; *Frank*, 506 N.Y.S.2d at 875; *Polygram Records*, 170 Cal.App.3d at 554, 216 Cal.Rptr. 252. Cartoons are traditionally grounded in exaggeration and imagination, as opposed to fact. *See Yorty v. Chandler*, 13 Cal.App.3d 467, 471–72, 91 Cal.Rptr. 709 (1970). In addition, Dworkin herself is not *actually* represented in this cartoon; the speaker tells the other woman that she "reminds me of Andrea Dworkin." This is another obvious clue that what the cartoon portrays is a comment on Dworkin rather than factual statements about her. Finally, the language used in the other sentence of the caption clearly indicates that this cartoon makes no factual statement. The cartoon uses the word "dog" in

---

**8.** Courts that have tried to make the determination of whether a statement is one of fact or opinion have set forth various guidelines to be used in the analysis. The factors relied on by the Ninth Circuit require:

that the court examine the statement in its totality in the context in which it was uttered or published. The court must consider all the words used, not merely a particular phrase or sentence. In addition, the court must give weight to cautionary terms used by the person publishing the statement. Finally, the court must consider all of the circumstances surrounding the statement, including the medium by which the statement is disseminated and the audience to which it is published. *Information Control v. Genesis One Computer Corp.*, 611 F.2d 781, 784 (9th Cir.1980). *See also Mr. Chow*, 759 F.2d at 226 (factors include (1) the context in which the statements are made; (2) the language used—precise and literal or loose, figurative and hyperbolic; and (3) the potential for being objectively proven true or false); *Ollman*, 750 F.2d at 979 (same).

its slang sense of "something inferior of its kind" or "an unattractive woman or girl." Webster's New Collegiate Dictionary. This figurative or loose use of language is a chief factor in indicating that a statement is not one of fact. *See Mr. Chow*, 759 F.2d 219 at 226 (2nd Cir.1985). The caption, plus the cartoon context, clearly indicate to "even the most careless reader" that this situation is purely fictional. *See Greenbelt*, 398 U.S. at 14, 90 S.Ct. at 1542.

■ Exhibit B also is incapable of being interpreted as portraying actual events or facts regarding Dworkin. Again, it is helpful to consider the immediate context of the statements. The graphics of the entire photo-sequence, including the layout of the photos and the captions, resemble the familiar comic-book sequential panel layout. The title states that the photo-sequence was "DIRECTED BY AL GOLDSTEIN," thus indicating that it is the product of someone's imagination and interpretation. The narrator, who is the man in the photos, turns out to be the "director." He refers to the piece throughout as his "fantasy." Although this kind of labelling cannot be determinative of whether a statement is one of fact or fantasy, such cautionary terms must be given some weight. *See Information Control*, 611 F.2d at 784. The final scenes, which depict a violent sexual assault and orgy, obviously do not describe reality. These events occur in the open street during what appears to be daylight. In addition, the women who instigate and participate in the acts are portrayed at the outset of the photo-sequence as protestors of pornography. No reasonable reader could believe that such women would initiate and engage in the kind of violent and degrading sexual activity that they oppose. Exhibit B is unquestionably an attempt at satiric fantasy and could not reasonably be viewed as expressing any factual statement.[9] *See Pring*, 695 F.2d 438.

■ Exhibit C indicates on its face that it cannot be taken literally. It is filled with cautionary statements. The opening phrase is the disclaimer, "We don't believe it for a minute...." Although this type of disclaimer may be seen as highly self-serving, it would put a reasonable reader on notice that the material is, at least, of questionable veracity. In addition, the man in the photo is identified as "Robby 'the Rock' Ricardo—a distant relative of *I Love Lucy*'s Ricky." Ricky Ricardo, of course, is a widely known fictional television character.[10] That "Robby" is identified as his relative is a clear indication that the identifications of the persons in the photo are farcical. Finally, the last line in the caption regarding the photo emphasizes the tone of incredulity set by the first line, "Understandably, we gave that editor the day off to watch *Leave It to Beaver* reruns." Exhibit C simply is too absurd on its face to be capable of a defamatory meaning.

It is also important, regarding all three exhibits, to consider the surrounding circumstances in which these statements were made, the medium by which they were published and the audience for which they were intended. *See Koch II*, 817 F.2d at 509; *Information Control*, 611 F.2d at 784. As Dworkin states in her complaint, she has been a leading opponent of pornography. She has written and spoken out against pornography on numerous occasions and campaigned in major cities to enact ordinances that would have provided women with a private cause of action against pornographers for violation of their civil rights. *See* First Amend. Comp. ¶ 4. *See generally American Booksellers Ass'n v. Hudnut*, 598 F.Supp. 1316 (S.D.Ind. 1984), *aff'd*, 771 F.2d 323 (7th Cir.1985), *aff'd per curiam*, 475 U.S. 1001, 106 S.Ct. 1172, 89 L.Ed.2d 291 (1986). As Dworkin

---

**9.** Dworkin concedes that the events portrayed in Exhibit B have no basis in reality. When asked at her deposition what false statements she thought it contained, she replied:

I think that it is incomprehensible. It is beyond false. It doesn't—it is so unrelated to having anything to do with a fact that it is beyond false. It is an absolute slime. It is false to the point that it is slime.

Dworkin Depo. at 152 (Feb. 11, 1986).

**10.** Of which the court takes judicial notice. F.R.Evid. 201.

points out, it was her leadership in the antipornography movement that motivated Flynt to publish about her. *See* Pltf's. Opp. to Mo. for Summ. Judg. at 48–49 ("Pltf's. Opp.") (quoting and discussing Flynt's deposition testimony.)

It is readily apparent, even to Dworkin, that one of Flynt's tactics in responding to her efforts in fighting pornography is to attack her personally by making her a part of the very kind of degrading and dehumanizing material she opposes. *See id.* at 45. When one considers this larger, politi-

cal context, it becomes even more clear that these exhibits are not an attempt to portray actual facts or events, but rather a lampoon, albeit vicious, of Dworkin and her cause.[11]

 It is not clear that material should be placed in "the legal category of opinion, which sounds, and often is a dignified classification for the pursuit of honest and fair debate....." *Koch II,* 817 F.2d at 510. However, it is clear that no reasonable reader could view Exhibits A, B and C as

---

**11.** Defendants contend that none of the exhibits is actionable because none is "about" Dworkin. To be actionable, a defamatory statement must be "of and concerning" the plaintiff. *See Fetler v. Houghton Mifflin Co.,* 364 F.2d 650, 651 (2d Cir.1966) (quoting *Julian v. American Business Consultants, Inc.,* 2 N.Y.2d 1, 17, 155 N.Y.S.2d 1, 15, 137 N.E.2d 1, 11 (1956)); *Blatty v. New York Times Co.,* 42 Cal.3d 1033, 1042 (1986); *Cinker, Inc. v. Northern Gas Co.,* 578 F.Supp. 112, 115 (D.Wyo.1983). The requirement of a specific reference to plaintiff has been held to be a constitutional one. *Rosenblatt v. Baer,* 383 U.S. 75, 83 (1966).

As the court in *Pring* noted, some courts have confused the issue of whether a statement is "of and concerning" plaintiff as a matter of identity with the issue of whether the statement can be reasonably understood as describing actual facts about the plaintiff, when they are really two separate issues. 695 F.2d at 339–40. The function of the "of and concerning" requirement is to prevent lawsuits by "those who merely complain of nonspecific statements that they believe cause them some hurt," allowing only those brought by persons "who are the direct object of criticism." *Blatty,* 42 Cal.3d at 1044. In contrast, the "reasonably understood" issue embodies the basic requirement "of any defamation action; that is, a false representation of fact." *Pring,* 695 F.2d at 440.

To satisfy the "of and concerning" requirement, plaintiff must show that:

the libel designates the plaintiff in such a way as to let those who knew him understand that he was the person meant. It is not necessary that all the world should understand the libel; it is sufficient if those who knew the plaintiff can make out that he is the person meant.

*Fetler,* 364 F.2d at 651. *See also Cinker,* 578 F.Supp. at 115 (the statement must "refer to some ascertained or ascertainable person.") Whether a statement is "of and concerning" plaintiff is ordinarily a question for the trier of fact. *See Handelman v. Hustler Magazine,* 469 F.Supp. 1048, 1049 (S.D.N.Y.1978).

Defendants' argument confuses the "reasonably understood" and "of and concerning" requirements. As in *Pring,* the central issue in this case is whether these exhibits can reasonably be understood to describe *actual facts. See Pring,* 695 F.2d at 440. The Court holds they cannot. However, the Court cannot, as defendants have asked, hold as a matter of law that the exhibits are not "of and concerning" Dworkin.

The Court is mindful of the rule that all justifiable inferences are to be drawn in Dworkin's favor on this motion for summary judgment. *See Anderson,* 106 S.Ct. at 2513. Although all of the exhibits portray characters who, on the face of the exhibits, do not purport to *be* Dworkin, they all explicitly *refer to her* by name (*i.e.,* "You remind me so much of Andrea Dworkin, Edna;" "the Andrea Dworkin Fan Club;" "this woman ... is the mother of radical feminist Andrea Dworkin"). Moreover, there is evidence that Exhibit C, while purporting to portray Dworkin's mother, was also, perhaps primarily, directed at Dworkin herself. When asked about Exhibit C, one of Hustler's editors responded, "Andrea Dworkin's name would have never come up in this copy if this person in this old picture didn't slightly resemble her." Lonn M. Friend Depo., at 47 (Dec. 3, 1985). It is certainly possible that Dworkin's mother's name was used merely because this is an old photograph, as indicated by the exhibit's title, "Porn From the Past."

Exhibits A and B also purport to portray people other than Dworkin. Exhibit A refers to "Edna" and Exhibit B refers to several women antipornography protesters (including two other well-known women). However, Dworkin is specifically named and linked to these characters.

It would not be unreasonable for a trier of fact to find that these exhibits are "of and concerning" Dworkin even if they are also "of and concerning" someone else, such as Dworkin's mother. *See* Restatement (Second) of Torts § 564, Comments *d* (fictitious character) and *e* (statements referring to one person but defaming another); *Wildstein v. New York Post Corp.,* 40 Misc.2d 586, 243 N.Y.S.2d 386, 390 (1963), *aff'd,* 24 A.D.2d 559, 261 N.Y.S.2d 254 (1965) (statement can be "of and concerning" more than one person). Thus, the Court cannot conclude as a matter of law at this stage that these exhibits are not "of and concerning" Dworkin.

statements of fact.[12] Consequently, the statements are not actionable.[13]

### C. *Falsity and Actual Malice*

■ Even if there were factual statements at issue here, Dworkin has admitted that she is a public figure. First Amend. Comp. ¶ 4. As such, she has the burden of proving that any such statements of fact are false. *See Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 106 S.Ct. 1558, 1563, 89 L.Ed.2d 783 (1986). In addition, Dworkin must show by ·clear and convincing evidence that defendants acted with actual malice. *See Anderson*, 106 S.Ct. at 2515; *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).[14]

■ Dworkin persists in using the term "malice" in its colloquial sense of "spite" or "ill-will." *See* Pltf's. Opp. at 45–50. As evidence of this malice, Dworkin quotes at length from verbal attacks defendants have made against other foes of pornography and against one of Dworkin's attorneys in this action. This misuse of the phrase "malice" is inexcusable in light of the long-established rule that "actual malice" in the First Amendment context does not include "spite, hostility or intention to harm." *Greenbelt*, 398 U.S. at 10, 90 S.Ct. at 1539. Actual malice is shown only when a defendant publishes a statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co.*, 376 U.S. at 279–80, 84 S.Ct. at 726. "Reckless disregard" means that the defendant published the statement despite entertaining "serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968).

Although she has the burden of proof on these issues, Dworkin has made no showing whatsoever of falsity or actual malice.[15]

**12.** Dworkin does attempt to identify certain false statements of fact implicit in these exhibits. She states:

> the libel is that [the woman portrayed in the exhibits] is sexual dirt—that she is a worthless human being because she *is* sexual dirt and that that [sic] is false.... [t]he libel is that her body is available for public consumption, and it is not—she does intellectual work. She is not available publicly in any sexual context....
>
> \* \* \* \* \* \*
>
> The three protrayals [sic] taken together establish that this is a woman who is, indeed, pornographic dirt entitled to no respect. This is the fact ferreted from the publications. This fact is false and libelous and is entitled to no protection.

Pltf's. Opp. at 35–37 (emphasis in original) (citations to Dworkin's deposition testimony omitted). These statements, while reflecting Dworkin's feelings about this material, simply cannot be characterized as referring to facts. There is no way objectively to verify a statement such as "this is a woman who is pornographic dirt." *See Mr. Chow*, 759 F.2d at 226.

**13.** Defendants also contend that *all* claims based on the February and March, 1984, issues of Hustler (Exhibits A and B) are barred by the statute of limitations. There is a substantial disputed question of fact as to when these issues actually went on sale. Defendants submitted the declaration of Gerry Awang, the Circulation and Marketing Director of Flynt Distributing Company, Inc., which is the national distributor of Hustler. Awang sets forth the dates that the printer shipped the magazines at issue to local wholesalers and the dates that the magazines were scheduled to be put on sale and later taken off sale. However, plaintiff objects to this declaration because it is not clear from the declaration that Awang has personal knowledge of when the magazines *actually* were shipped and were put on sale, as opposed to when they were *scheduled* to be shipped and put on sale. In light of the other bases for disposing of this · motion, it is unnecessary to reach this issue.

**14.** Dworkin argues that under *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749 (1985), she need not show actual malice. This argument is patently meritless. "In sharp contrast to *New York Times, Dun & Bradstreet* involved not only a private-figure plaintiff, but also speech of purely private concern." *Philadelphia Newspapers, Inc.*, 106 S.Ct. at 1563. Here, Dworkin admits that she is a public figure. Moreover, while declining to characterize this material as involving matters of public concern, as Dworkin noted, Flynt attacked her because of her leadership status in the antipornography movement. *See* Pltf's. Opp. at 45. Thus, *Dun & Bradstreet* clearly is inapplicable.

**15.** There is some deposition testimony that would support an argument that Hustler acted with actual malice, although Dworkin does not cite it. One of Hustler's editors testified as follows at his deposition:

Thus, summary judgment must be granted to defendants as there is no genuine dispute of material fact to be tried. *See Celotex Corp.*, 106 S.Ct. at 2552–53; *Davis v. Costa-Gavras*, 654 F.Supp. 653, 659–60 (S.D.N.Y.1987).[16]

## D. *Invasion of Privacy*

■■■ New York law applies on this claim, as well as the defamation claim. *See* Part II.A. First Amendment considerations, however, are also present, as discussed below.

Under New York law, there is no common law right to privacy; the right to privacy is controlled by statute. *Lerman v. Flynt Distrib. Co.*, 745 F.2d 123, 129 (2d Cir.1984), *cert. denied*, 471 U.S. 1054, 105 S.Ct. 2114, 85 L.Ed.2d 479 (1985). Section 51 of the New York Civil Rights Law provides in relevant part:

> Any person whose name, portrait or picture is used within this state for advertising purpose or for the purposes of trade without [her] written consent … may maintain an equitable action in the supreme court of this state against the person, firm or corporation so using [her] name, portrait or picture, to prevent and restrain the use thereof; and may also sue and recover damages for any injuries sustained by reason of such use and if the defendant shall have knowingly used such person's name, portrait or picture in such manner … the jury in its discretion may award exemplary damages.

Q. You knew at the time you gave your approval to the words on Exhibit C–1 that the lady portrayed in the photograph was not Andrea Dworkin; right?
A. Absolutely.
Q. So you knew that that was untrue?
A. Of course.

Lonn M. Friend Depo. at 47 (Dec. 3, 1985). However, it is clear from the surrounding statements that Friend meant that the exhibit was untrue in the sense that it was fictional. *See id.* ("I honestly believe that this was a visual joke, and that was the extent of it."). *See Guglielmi v. Spelling-Goldberg Prod.*, 25 Cal.3d 860, 871 (1979) ("Every fiction writer knows his creation is in some sense 'false.' That is the nature of the art."). Thus, even if there were factual statements at issue here, there is no evidence of

On its face, the statute seems to provide a cause of action only for commercial appropriation.[17] *See Lerman*, 745 F.2d at 130. Plaintiff does not purport to claim commercial appropriation. She styles her claim as one of false light and public disclosure of private facts. *See* Pltf's. Opp. at 37–40.

Whether false light is a recognized cause of action in New York has not yet been decided. See *Arrington v. New York Times Co.*, 55 N.Y.2d 433, 449 N.Y.S.2d 941, 945, 434 N.E.2d 1319, 1323 (1982), *cert. denied*, 459 U.S. 1146, 103 S.Ct. 787, 74 L.Ed.2d 994 (1983); *Davis v. High Society Magazine, Inc.*, 90 A.D.2d 374, 457 N.Y. S.2d 308, 314 n. 3 (1982). However, courts have construed the language of § 51 as broad enough to include this claim. *See Time, Inc. v. Hill*, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967); *Lerman*, 745 F.2d at 134.

To state a false light claim, plaintiff must show that "the false light in which the other was placed would be highly offensive to a reasonable person" and that "the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Id.* at 135. However, the essence of a false light claim is the deliberate falsification or fictionalization of *factual* events or circumstances *represented to be true*. *See Davis*, 457 N.Y.S.2d at 315; *Falwell v. Flynt*, 797 F.2d 1270, 1278 (4th Cir.1986), *cert. granted*, —— U.S. ——, 107 S.Ct. 1601, 94 L.Ed.2d 788 (1987) (*"Falwell I"*). In *Pring*, the court

actual malice that would preclude granting summary judgment to defendants.

**16.** Dworkin suggests that the "actual malice" standard does not apply to obscene materials. Even if such an exception exists, it is inapplicable in this case because the Wyoming federal court held that this material is not obscene. *See Dworkin II*, 634 F.Supp. at 731.

**17.** Four different types of claims for invasion of privacy have been recognized by various authorities. They include: (1) intrusion on one's personal solitude, (2) public disclosure of private facts, (3) publicly placing a person in a false light and (4) commercial appropriation of a person's name or likeness. *See Lerman*, 745 F.2d at 130.

held that the First Amendment barred the plaintiff's invasion of privacy claim because the statements at issue could not be reasonably understood as describing actual facts about plaintiff or actual events in which she participated. *See Pring,* 695 F.2d at 442. As discussed in Part II.B, no reasonable reader could interpret these exhibits as expressing statements of fact. Thus, they are incapable of placing Dworkin in a false light as a matter of law and are not actionable.[18]

■ Dworkin also asserts a claim for invasion of privacy based on the public disclosure of private facts, citing Restatement (Second) of Torts § 652D. This claim also is without merit. New York does not recognize this common law tort. *See Lerman,* 745 F.2d at 129. Moreover, even if such a cause of action were viable, Dworkin could not pursue it in this case as there simply are no *facts,* private or otherwise, disclosed.[19]

E. *Intentional Infliction of Emotional Injury and Outrage*

■ Dworkin has also asserted claims for intentional infliction of emotional injury and outrage. These are one and the same cause of action. Restatement (Second) of Torts § 46, cited by Dworkin as embodying the tort of outrage, is cited by New York, California and Wyoming's highest courts as embodying the tort of intentional infliction of emotional distress. *See Fisher v.*

*Maloney,* 43 N.Y.2d 553, 402 N.Y.S.2d 991, 373 N.E.2d 1215, 1217 (1978); *Cervantez v. J.C. Penney Co.,* 24 Cal.3d 579, 593, 156 Cal.Rptr. 198, 595 P.2d 975 (1979); *Leithead v. American Colloid Co.,* 721 P.2d 1059, 1065–66 (Wyo.1986).

■ Whatever the label, Dworkin cannot maintain a separate cause of action for mental and emotional distress where the gravamen is defamation. *See Wilson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 111 A.D.2d 807, 490 N.Y.S.2d 553, 555, *aff'd,* 66 N.Y.2d 988, 499 N.Y.S.2d 395, 489 N.E.2d 1297 (1985); *Fisher,* 402 N.Y.S.2d at 992, 373 N.E.2d at 1217; *Flynn v. Higham,* 149 Cal.App.3d 677, 681–82, 197 Cal. Rptr. 145 (1983). *See also Silvester v. American Broadcasting Co.,* 650 F.Supp. 766, 780 (S.D.Fla.1986) (applying Florida Law). *Contra Falwell I,* 797 F.2d at 1276. Without such a rule, virtually any defective defamation claim, such as the one in this case, could be revived by pleading it as one for intentional infliction of emotional distress; thus, circumventing the restrictions, including those imposed by the Constitution, on defamation claims.[20] *See Flynn,* 149 Cal.App.3d at 682, 197 Cal.Rptr. 145. *See also Pring,* 695 F.2d at 442. *See generally Falwell v. Flynt,* 805 F.2d 484, 488–89 (4th Cir.1986) (Wilkinson, J., dissenting from denial of rehearing *en banc* ) (*"Falwell II"*). *Cf. Blatty,* 42 Cal.3d 1033 at 1044–45, 232 Cal.Rptr. 542, 728 P.2d 1177 (1986) ("First Amendment limitations are

---

18. Even if there were factual statements at issue here, as with her defamation claim, Dworkin has the burden of proving the falsity of such statements and actual malice on the part of defendants. *See Time, Inc. v. Hill,* 385 U.S. at 389; *Meeropol v. Nizer,* 560 F.2d 1061, 1066 (2d Cir.1977). As discussed in Part II.C, she has failed to make this showing.

19. Because of this disposition of the privacy claim, the Court does not reach defendants' further contention (which does not appear to be well taken) that because Dworkin admits that she is a lesbian and has written about lesbianism, she cannot claim that the exhibits, which portray homosexual and heterosexual acts, disclose *private* facts, *i.e.,* that by becoming a public figure, by writing about sexuality and by publicly disclosing her own sexual orientation she has forfeited her right to privacy about sexual matters.

20. Another court explained its rationale for this rule stating:

> although the gravamen of a defamation action is injury to reputation, libel or slander also visits upon a plaintiff humiliation, mortification and emotional distress. In circumstances where a plaintiff states a case of libel or slander, such personal distress is a matter which may be taken into account in determining the amount of damages to which the plaintiff is entitled, but it does not give rise to an independent cause of action on the theory of a separate tort. To accede to the contentions of the plaintiff in this case would be, in the words of Prosser, a step toward "swallowing up and engulfing the whole law of public defamation."

*Grimes v. Carter,* 241 Cal.App.2d 694, 702 (1966).

applicable to all claims, of whatever label, whose gravamen is the alleged injurious falsehood of a statement....").

In this case, Dworkin's emotional distress claim is based only on the allegations underlying her defamation claim. As a result, her intentional infliction of emotional distress/outrage claim must fail.[21]

### III. CONCLUSION

When confronted with the task of clothing "speech" of Hustler's ilk with First Amendment protection, courts generally conclude with an apologia. *See, e.g., Pring,* 695 F.2d at 443; *Dworkin II,* 634 F.Supp. at 731. As Judge Wilkinson pointed out in words equally applicable to Dworkin: [22]

> Speech such as the *Hustler* publication serves in the [marketplace of ideas] only to discredit the speaker. It does not persuade, and it detracts not one whit from [Dworkin's] reputation. Vicious and gratuitously personal attacks may well attract support and sympathy for their targets.

*Falwell II,* 805 F.2d at 488. Dworkin must seek redress through her own writing and speaking—by exercising the same constitutional freedom that bars her claims for relief in this action. The First Amendment works as a sword as well as a shield.

IT IS ORDERED THAT:

Defendants' motion for summary judgment is granted as to plaintiff's remaining claims of libel, invasion of privacy and intentional infliction of emotional injury/outrage. Judgment shall be entered in accordance herewith.

---

**21.** Because of this holding, although it is for the court to determine in the first instance whether a defendant's conduct may reasonably be considered so extreme and outrageous as to warrant liability for intentional infliction of emotional distress, *see Koch I,* 607 F.Supp. at 226; Restatement (Second) of Torts § 46, Comment *h,* the Court declines to reach this issue.

**22.** Judge Wilkinson was speaking of the Reverend Jerry Falwell, a nationally known fundamentalist minister and another target of Hustler's "humor".