764 P.2d 492

Harry MENDOZA, Plaintiff–Appellee,

v.

The GALLUP INDEPENDENT CO., John K. Zollinger, Robert C. Zollinger, Donald W. Green a/k/a "Veritas", and Reed Eckhardt, Defendants–Appellants.

No. 10501.

Court of Appeals of New Mexico.

Aug. 16, 1988.

Lowell E. McKim, McKim, Head & Ionta, P.C., Gallup, for plaintiff-appellee.

Joseph L. Rich, Schuelke & Rich, Gallup, George R. McFall, Joseph E. Roehl, R.E. Thompson, Modrall, Sperling, Roehl, Harris & Sisk, P.A., Albuquerque, for defendants-appellants.

## OPINION

GARCIA, Judge.

Defendants appeal the trial court's denial of their motion for summary judgment in a defamation action. We granted defendants' application for interlocutory appeal, which raised the following two issues: (1) whether the statement at issue constitutes opinion, as a matter of law and, accordingly, whether the trial court erred in denying defendants' summary judgment motion; and (2) whether defendants made a prima facie showing that the statement, regardless of its nature, was made absent actual malice. We deem issue one to be dispositive and, accordingly, will not address the remaining issue. We reverse.

This action arose out of the publication of a column entitled "The Week's Wash" appearing in the opinion-editorial section of "The Gallup Independent" on April 18, 1987. *See* attached Appendix A. Plaintiff, Harry Mendoza (Mendoza), a Gallup city councilman, sued defendants for libel. The column describes a Gallup "tourism promotion" office outside of City Hall. Several tourists approach the "tourism counsel-

or" for information. The counselor's office is made of packing crates, much like the famed character Lucy's psychiatrist office in Charles Shultz' "Peanuts" cartoon. The defamatory statements arise from the following exchange between the "tourism counselor" and "two tall, swarthy suit-and-tie types":

"I'm agent Frammis and this is agent Stanfran," one said, flashing open a dark wallet with gold leaf and fine black printing inside. "We're here to investigate your City Council."

"R-r-right in there," WW [Week's Wash] stammered. "But it's not in session just now. C-can I direct you to any particular member?"

"We have received a report," said the other one, "that the council has been taken over by the Mexican Mafia. What can you tell us about that?"

This was scarey. Word sure travels fast.

"Well, um, er, the new council hasn't met yet. But the new mayor is known for shooting first and asking questions later."

They patted the bulges under their coats.

"B-but he doesn't take office until May 5," WW hurried on. "He's already taken one straw vote on replacing the city manager, however."

"That may be it," said agent Stanfran. "Did anything happen that might support our tip?"

"Well, it's only one instance, and it's pretty controversial," WW equivocated, "and I can't say if it's the start of a trend. But you can decide for yourself.["]

"The vote was Munoz, Mendoza, and Gutierrez on one side and Richards and Hight on the other."

Mendoza alleges that the above statements imputed his involvement in corruption, dishonesty and criminal activity. The thrust of Mendoza's complaint is that the writing falsely links him to the Mexican Mafia. He does not contend, however, that the writing accuses him of any specific

criminal act or wrongdoing. Defendants moved for summary judgment on two grounds: (1) that the column was opinion and absolutely privileged as a matter of constitutional law; and (2) that defendants did not knowingly or recklessly publish a false statement of fact and, thus, did not act with actual malice as required by *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Mendoza responded with affidavits of various persons who interpreted the column as conveying factual allegations concerning him, together with his own affidavit on the issue of actual malice. The trial court, carefully and correctly noting factual disputes in the affidavits, denied defendants' summary judgment motion and certified its order for interlocutory appeal.

Whether the published statement constitutes opinion or fact.

▮ We initially note that if the statements are purportedly "facts" as opposed to "opinions", then the trial court properly denied summary judgment because there are factual disputes on material issues which are properly resolved by a fact finder. The same is not true, however, if the statements constitute opinion. An action for defamation lies only for false statements of fact and not for statements of opinion. *Saenz v. Morris*, 106 N.M. 530, 746 P.2d 159 (Ct.App.1987). We recognize that:

Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact.

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40, 94 S.Ct. 2997, 3006–07, 41 L.Ed.2d 789 (1974) (footnote omitted).

When the alleged defamatory statements could be fact *or* opinion, it is proper to deny summary judgment, as the trial court did here, and allow the fact finder to resolve the dispute. *See Marchiondo v. New Mexico State Tribune Co.*, 98 N.M. 282, 648 P.2d 321 (Ct.App.1981). However, if the statements are unambiguously opinion, the trial court may properly rule as a matter of law. *Marchiondo v. Brown*, 98 N.M. 394, 649 P.2d 462 (1982). Thus, we must initially determine whether the alleged defamatory material contains a protected statement of opinion.

In commenting on the differences between statements of fact and opinion, the California supreme court noted:

The distinction frequently is a difficult one, and what constitutes a statement of fact in one context may be treated as a statement of opinion in another, in light of the nature and content of the communication taken as a whole. Thus, where potentially defamatory statements are published in a public debate, a heated labor dispute, or in another setting in which the audience may anticipate efforts by the parties to persuade others to their positions by use of epithets, fiery rhetoric or hyperbole, language which generally might be considered as statements of fact may well assume the character of statements of opinion.

*Gregory v. McDonnell Douglas Corp.*, 131 Cal.Rptr. 641, 644, 552 P.2d 425, 428 (1976).

▮ In resolving the distinction between fact and opinion, the trial court should consider: (1) the entirety of the publication; (2) the extent that the truth or falsity of the statement may be determined without resort to speculation; and (3) whether reasonably prudent persons reading the publication would consider the statement to be an expression of opinion or a statement of fact. *Marchiondo v. Brown; see* SCRA 1986, 13–1004. In applying the above test to the statements, we believe the column expresses statements of opinion rather than fact.

▮ In considering the "entirety" requirement, the published statement must be read in context. First, the column here was situated on the "Opinion" page of the newspaper along with four other articles and an editorial cartoon. Readers of the opinion-editorial page generally expect to read the columnist's views and opinions as opposed to factual news stories. *Aldoupo-*

*lis v. Globe Newspaper Co.*, 398 Mass. 731, 500 N.E.2d 794 (1986) (En banc); *see Ollman v. Evans,* 750 F.2d 970 (D.C.Cir.1984), *cert. denied,* 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985); *Loeb v. Globe Newspaper Co.,* 489 F.Supp. 481 (D.Mass.1980); *National Rifle Ass'n v. Dayton Newspapers, Inc.,* 555 F.Supp. 1299 (S.D.Ohio 1983).

■ Second, the column indicates, by the tag line "DAYS OF OUR LIVES", that it is fictitious in nature and not intended to represent factual statements. In addition, the column is entitled "The Week's Wash" and depicts a drawing of a clothes line laden with clothing. The column's setting is unreal. The tourism office is set up "on the front walk of City Hall in a booth made out of a couple of apple crates, Lucy-style." The homemade sign reads: " 'Free Tourism Information—The tourism counselor is IN.' " Equally fictitious are the visitors to the booth: one visitor has heard that " 'Red Rock Park has cracks in it the size of the Grand Canyon * * * * ' "; another has heard that Gallup has the " 'world's biggest zero.' " [1] The tongue-in-cheek style used by the author alerts all but the most careless readers that the descriptions were no more than rhetorical hyperbole. *See Pring v. Penthouse Int'l, Ltd.,* 695 F.2d 438 (10th Cir.1982), *cert. denied,* 462 U.S. 1132, 103 S.Ct. 3112, 77 L.Ed.2d 1367 (1983); *Catalfo v. Jensen,* 657 F.Supp. 463 (D.N.H.1987); *Ollman v. Evans.*

■ Moreover, under the second-prong of the *Marchiondo* test, the column constitutes "pure opinion". *See* 3 Restatement (Second) of Torts § 566 (1977); *Saenz v. Morris.* Under the Restatement, "[a] defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion." Restatement, *supra,* § 566 at 170. However, if the material, as a whole, fully discloses the facts upon which the opinion

is based and permits the reader to reach his own opinion, the statement is generally an opinion rather than an assertion of fact, and is absolutely protected. *Saenz v. Morris; Kutz v. Independent Publishing Co.,* 97 N.M. 243, 638 P.2d 1088 (Ct.App.1981).

In the case at bar, "WW" is asked whether the Mexican Mafia has taken over the council. "WW" reaches no conclusion, but reports the vote results on the straw poll, together with the surnames of the councillors who cast the votes. The writer invites readers to reach their own conclusions by stating to "agents" Stanfran and Frammis, " '[I]t's only one instance * * * and I can't say if it's the start of a trend. But you can decide for yourself.' "

Plaintiff argues that the writer's observation that: "This was scarey. Word sure travels fast." implies that the author had private knowledge that the council had been taken over by the "Mexican Mafia." We disagree. When placed in context and read as a whole, we believe the column discloses the factual basis for the writer's opinion, namely, the straw vote to replace the city manager, and the ethnicity of the councillors who cast the votes. The opinion leaves no room for speculation or implication that the writer has private knowledge of defamatory facts. *See Marchiondo v. Brown.*

■ For the third-prong of the *Marchiondo* test, plaintiff submitted affidavits of various members of the Gallup and Raton community to show that six reasonably prudent persons interpreted the column's statements as a representation of fact. Each affiant expressed their belief that the term "Mexican Mafia" referred to a vast criminal organization whose leaders are of Mexican descent. Each also interpreted the column as a statement that Mendoza was either a member of, or under the control of, the "Mexican Mafia." These affidavits, though well-intended, are irrelevant. Whether the statements are capable of a defamatory meaning is initially a question

---

**1.** During the municipal elections in Gallup, New Mexico, which preceded publication of the article, Munoz, candidate for office, referred to councilman George Hight as a "Big Zero." The candidate's remark, together with his subsequent apology, were previously published in The Gallup Independent.

of law for the trial court, not a question of fact. *See Marchiondo v. New Mexico State Tribune Co.*

In addition to failing the *Marchiondo* three-prong test, plaintiff's reliance on *Cianci v. New Times Publishing Co.*, 639 F.2d 54 (2nd Cir.1980), is misplaced. In *Cianci,* plaintiff was accused, in a published magazine article, of specific criminal acts, including rape, and of paying off the victim to avoid prosecution. The *Cianci* court held that the charges were not employed in a " 'loose, figurative sense' " or as " 'rhetorical hyperbole,' " as here, rather, the court determined that the statement imputed specific criminal activity. *Id.* 639 F.2d at 64. Such is not the situation here. No specific accusation was made against Mendoza; no specific criminal act was charged. Further, the underlying facts giving rise to the publisher's opinion are apparently undisputed: a straw vote was taken; the vote was three-to-two; three councillors with Hispanic surnames voted one way, while the two remaining councillors voted another. This was not the case in *Cianci,* where the underlying facts were vigorously challenged.

Nor is plaintiff's reliance on *Hustler Magazine v. Falwell,* 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988) well founded. In *Hustler Magazine,* plaintiff Falwell sued defendant Hustler Magazine for invasion of privacy, libel, and intentional infliction of emotional distress. *Id.* The suit arose out of Hustler's publication of an advertisement parody concerning Falwell. *Id.* The trial court directed a verdict for defendant on the privacy claim and the jury found for defendant on the libel claim. *Id.* The jury, however, awarded damages to plaintiff on his claim for intentional infliction of emotional distress. *Id.* On appeal, the Supreme Court reversed Falwell's money judgment, holding that public figures and public officials may not recover for the tort of intentional infliction of emotional distress by reason of publication absent a showing that the publication contained a false statement of fact which was made with actual malice. *Id.*

Plaintiff notes that "as outrageous as the statements were in the offending article," the trial court in *Hustler Magazine,* nonetheless, allowed the libel claim to go to the jury. Nevertheless, we note that the jury found that the ad parody could not reasonably be understood as describing actual facts about plaintiff. *Id.* The question of whether plaintiff's libel claim in *Hustler Magazine* should have been allowed to go to the jury was not before the Supreme Court. The true import of *Hustler Magazine* is not the trial court's denial of defendant's summary judgment motion, but its extension of the First Amendment protections, previously announced in *Sullivan,* to cases of intentional infliction of emotional distress.

 We conclude that the alleged defamatory statement is an editorial opinion on a matter of local political interest. One of the most fundamental privileges protected under the First Amendment is the right to free, uninhibited, political debate. The Week's Wash column is a criticism of city officials and the incoming administration. Public officials, such as plaintiff, are often the target of "vehement, caustic and unpleasantly sharp attacks." *New York Times Co. v. Sullivan,* 376 U.S. at 270, 84 S.Ct. at 720; *see Hustler Magazine v. Falwell.* While we empathize with those stung with the barbs of racial slurs or ephitets, we must also recognize the vital role played by free, open and public discourse. First Amendment protections encourage and foster the dissemination of ideas and opinions. A publication is not deemed libelous simply because the opinion is expressed in terms of strong invectives, profanity or sarcastic language. *Marchiondo v. New Mexico State Tribune Co.* Further, fiery political dialogue, rhetoric, and public debate, including the use of epithets and hyperbole, are protected under the First Amendment of the Federal Constitution. *Id.*

In *Communications Workers of Am., Local 8611 v. Archibeque,* 105 N.M. 635, 735 P.2d 1141 (1987) the supreme court held that use of characterizations such as "amoral," "totally void of character," and

**726**

"an embarrassment," in the context of a labor dispute, were rhetorical hyperbole and not misstatements of fact. *See also Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers, AFL–CIO v. Austin,* 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974) (in context of labor dispute, use of term "scab," accompanied by highly derogatory definition, held to be "rhetorical hyperbole," protected by First Amendment); *Greenbelt Coop. Publishing Ass'n v. Bresler,* 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970) (in context of dispute over zoning variances, use of term "blackmail" to describe plaintiff's negotiation position was "rhetorical hyperbole" and could not reasonably be understood to impute crime of blackmail); *Kutz v. Independent Publishing Co.* (average reader would have no difficulty in reading "rabid environmentalist" to be expression of writer's opinion).

■ Likewise, we are not convinced that the statements here could reasonably be interpreted as imputing criminal conduct to plaintiff. We believe that the column's use of the term "Mexican Mafia" in the context of the debate over issues of public interest is rhetorical hyperbole. *See Communications Workers of Am., Local 8611 v. Archibeque.* Accordingly, we deem, as a matter of law, the statements to have been "opinion" and not "fact." Hence, we reverse the trial court and remand with instructions that defendants' summary judgment motion be granted and Mendoza's complaint be dismissed with prejudice. By virtue of our determination that the statements are protected as a matter of law, we need not discuss defendants' second issue.

We remand with instructions to dismiss Mendoza's complaint with prejudice.

IT IS SO ORDERED.

BIVINS and APODACA, JJ., concur.

APPENDIX A

# Opinion

The Independent
Gallup, N.M.
Saturday, April 18, 1987

8

# Debate on missiles just beginning

## White House, NATO pick up where George Shultz left off

By David K. Shipler
The New York Times

BRUSSELS, Belgium — Now that Secretary of State George P. Shultz has finished three days of bargaining with the Russians on removing nuclear missiles from Europe, the other negotiations are beginning — those within the Reagan administration and within the North Atlantic Treaty Organization.

And they may be nearly as difficult. Shultz set the stage for the internal struggle with a virtual endorsement on Thursday of Moscow's new proposal to ban all Soviet and American short-range as well as medium-range nuclear missiles from Europe.

After meeting with NATO foreign ministers, Shultz told a news conference that his talks in Moscow had "created a great opportunity for the alliance."

He added that "we have the basic elements in place for a good agreement" by which "we can bring this whole pattern of Soviet deployment we've objected to back under control, and, from our point of view, that's good."

But the idea of a short-range ban, while attractive, has caused discomfort among Pentagon hard-liners and some West Europeans, who worry that it might be a step toward the "denuclearization" of Europe and a resulting West European vulnerability to superior Soviet conventional forces.

The counterargument holds that Europe still is protected by an umbrella of American strategic weapons, including submarine-launched ballistic missiles, bombers and intercontinental ballistic missiles

But that, in turn, raises fears that the policy of "flexible response" will be undermined by the abolition of short range and medium range missiles. Flexible response is the ability to meet a certain level of Soviet attack in Europe at the same level without having to resort to strategic weapons and full-scale nuclear war.

"It's a very important element of the picture," Shultz declared. "It means you don't limit yourself to a tight-switch approach."

Flexible response, he insisted, "will be maintained, whether we accept the Soviet short-range offer or not."

Other American officials pointed out that the Soviet American agreement would not ban the Europeans' own short range missiles, which are defined as those capable of flying 300 to 600 miles

Nor would it affect American bombers of various ranges or cruise missiles, which could be launched from ships off the European coasts to provide a flexible response.

Some Europeans worry that the needs of American disengagement from the European theater would be sewn in this accord. But American officials want to know whether Europeans would permit the deployment of short range missiles on their territory.

The United States does not have any at all now, although it controls the nuclear

warheads for about 70 Pershing 1A missiles belonging to West Germany. American negotiators say these would not be banned by a Soviet American treaty

The Soviet offer would seem to make it very difficult politically for European governments to permit such deployment, in which case American officials see no point in pressing the Russians for the right to build up the American short range arsenal to the Soviet level, now estimated at 130 missiles.

That has been the American goal since the two sides agreed to ban medium-range missiles from Europe. Concerned that the Russians might circumvent that ban by shifting to shorter-range weapons, the Americans called for a ceiling for both sides equivalent to the current Soviet level.

One idea, reportedly advocated by the Pentagon, was to convert Pershing 2s from medium-range to short-range by removing one rocket stage, the result would be called the Pershing 1B.

Accepting the Soviet offer to eliminate short range missiles would mean abandoning this conversion, of course, and how the debate on this will play out in the administration is a question.

Shultz is a team player, and he is unlikely to have sounded so approving on Thursday without encouragement from President Reagan. Shultz spoke to the president from Moscow on a scrambled telephone in a special communications van that was flown in to avoid embassy bugs

But there is hardly a consensus in the administration on a short range measure. And Shultz's record in forging policy out of contention is less than sterling.

He did not do very well in the internal debates that preceded his trip, losing to hawks' lines in the Pentagon in formulating major positions on intercontinental ballistic missiles and space-based defenses. One official described those arguments between Shultz and Defense Secretary Caspar W. Weinberger as "the most acrimonious" ever

The administration's internal disputes are less intense on the European issue than in the strategic area, however, and if questions can be resolved on verifying compliance and on linking the short range withdrawal with the medium range ban, the Soviet offer may prove irresistible to Reagan.

American negotiators are not sure about Soviet willingness to make the short-range ban part of the medium range treaty.

In Prague last week, Mikhail S Gorbachev proposed "to start talks on the reduction and later elimination" of short range missiles, "and not to link this with the course or the result of the solution of the medium-range missiles issue.''

During the Moscow talks this week, however, the Soviet leader "expressed the readiness to record in an agreement on medium range missiles the Soviet Union's obligation to eliminate its shorter-range missiles,'' according to Tass, the official Soviet news agency

# National renewal under way

By Jim Fain
Cox News Service

WASHINGTON — Most religions celebrate renewal in spring, but none with more ebullience than Christianity.

Nature pitches in, decorating Easter's open tomb with a sunburst of beauty to symbolize the triumph of life over death, of hope as redeemer of the human condition. It is not a season for sourpusses

With a little luck, this year's reawakening may be more than ceremonial. Something is stirring under the surface. Something tentative, unfocused, yet unmistakable We are beginning a mid-course correction

Reaganaut Republicans now speak favorably of compassion They tinker with welfare without donning rubber gloves They talk of catastrophic health insurance, job training, beefing up education, maybe even rebuilding rotting bridges, highways and tunnels

Congressional Democrats, of all people, try in fumbling but earnest ways to lower the deficit Even Gorbachev is in the act, attempting to shame Reagan into a minor arms agreement by not just accepting his old offer but raising it

Not to gush. Problems abound Except for the richest tenth, all Americans have suffered a loss in living standard since 1973 The poorest one-fifth saw real family income drop one-third between '73 and '85 Only the handful with $25 million in the bank have truly made out on Reaganomic tax cuts

Between government and corporate mismanagement, we have thrown away our competitive edge Many of us — including our children — fear they will never achieve a lifestyle equaling our own This is not the way we like to think in America.

Well, except for Easter's brief brilliance, who promised us a rose garden? If there's no shortage of terrors today — from AIDS to co: — our problems we can't exactly inflict city Saber tooth tigers and black plague weren't fun and games either

Vietnam was a downer, as were Watergate and the ghastly murders of the Kennedys and Martin Luther King. Trauma was an inevitable result

We have been navigating the shoals of grief, most recently denial With Reagan as Pied Piper, it was easy to revel in painless patriotism and borrowed wealth

Most of us felt the Great Society went ridiculously far in big daddy government We were ready to retrench But we also know government has an indispensable role in solving human problems (and not just as religious duty beans).

We want to get cracking on schools and whatever else we need to hold our own economically We abhor the growth of hunger and homelessness

Pollsters tell politicians what we are thinking, which is why Republican chairman Frank Fahrenkopf discovered the joys of compassion In 1988, we will swing back toward the political middle.

There is a spirit of realism, of pragmatism, running through the emerging presidential campaign It may mandate a healthy reaction against the hype and fantasy of "morning in America" feel good Reaganism

Already there are signs of hard slogging new muscle in industry. We probably are not as uncompetitive as we look

We are a sound and decent people who love this country and will sacrifice for it if shown the way Almost surely, we will find new forms of national service soon to harvest these patriotic impulses

# New-breed spouses

## Candidates' wives believe in exercising influence

By David S Broder
The Washington Post

WASHINGTON — Tipper Gore's first book, "Raising PG Kids in an X-Rated Society," is described as a "call to arms" against "the shockingly explicit and brutally violent media messages found in today's rock music, videos, movies and advertisements."

It was published this month just as her 38-year-old husband, Sen. Albert Gore Jr , D-Tenn , was announcing a presidential bid based on expertise in arms control, competitiveness policies, environmental and medical ethics questions

Victor Ashe, the Republican who lost to the Gores in the 1984 Senate race, says the timing was "very definitely" no coincidence

"They are a couple who know where they're going They work as a team She takes care of the right and he takes care of the middle and the left," he said

One need not accept Ashe's conclusion to recognize that Tipper Gore is one of the new-breed spouses who are likely to redefine the concept of the candidate's wife in 1988 and of First Lady in 1989.

"If the world is having trouble with a Nancy Reagan" exercising influence in the White House, says Ruth Mandel, director of the Center for the American Woman and Politics at Rutgers Universit ty's Eagleton Institute, "what will people do with a Liddy Dole or a Hillary Rodham or a Kitty Dukakis?"

The spouses she mentioned are those of Sen. Bob Dole, R-Kan , Democrat Arkansas Gov. Bill Clinton and Massachusetts Gov Michael S Dukakis, also a Democrat. They are notable examples of women who do much more than "stand quietly at his side and smile," as Ms . Mandel described the traditional role

Elizabeth Dole is, of course, the secretary of transportation, having served previously on the White House staff Hillary Rodham Clinton is a lawyer, a children's rights advocate and the head of the education reform commission that sparked a major school improvement program in Arkansas

Kitty Dukakis, a businesswoman, headed the governor's task force on homelessness and has worked on refugee programs as well as being one of her husband's best fund raisers

Jeanne Simon was an Illinois legislator when she married her husband, Paul, now senator from Illinois and a Democratic presidential hopeful She is also an author, an activist on issues from arms control to library funding and almost last year's Democratic candidate for lieutenant governor

Hattie Babbitt is a trial lawyer and "valued counselor," says her candidate husband, Bruce, the former governor of Arizona.

Elise duPont was a foreign aid official in the first Reagan term and has run a tough but losing race for the House seat held by her husband, Pierre, before he became governor of Delaware Jill Biden, wife of Sen Joe Biden, D-Del , teaches adolescents at the Rockford Center, a home for severely retarded people

These are strong women Even those women who appear closer to the traditional model of homemaker, mother, companion and hostess — the Barbara Bushes of both parties — are known as people who exert major influence on their husbands

Jack Kemp routinely introduces his wife, Joanne, as "the real quarterback of the Kemp family," and staff members say it was Joanne who ended hours of bickering on the direction of his announcement speech with a few clear sent ence She also reinforces his anti abortion views

Betsy Griffith, a historian of feminism, says that when she observes that for many years "male candidates encouraged their wives to pretend indifference and ignorance of political matters, even though it's often been clear they have been full partners in political judgments and political ambitions,"

The acknowledgment of what Ms Mandel calls "women's more outspoken life patterns" is a victory for candor. But, as she also observes, "it really complicates things"

When marriages are partnerships of independent, able and co-equal people, and one of them seeks the presidency, new issues are created for voters, for reporters and for both spouses

It would be fatuous to suppose that women with years of experience in government and/or clear views on public policy will be of no importance in govern ments their husbands head It would be sexist to suggest that they might not be qualified to play some formal or informal role in the administration

But the Constitution did not envisage the presidency as a dual office, and it is not clear what standards or methods are appropriate for ensuring accountability in the unelected half of these modern marriages

I am not suggesting a spouses debate But Mrs. Dole's concepts of regulatory reform, Mrs Simon's disarmament policies, Mrs. Gore's definition of porno graphy and several spouses' education theories seem legitimate areas for inquiry — either of the candidate or the spouses

As Ms. Mandel said, "We may be clear as an individual, but we've always been interested in his relationships, In earlier days, the press always worried about what first ladies wore Now, the relevant question is, 'What does she think'' —

The message to the campaign press corps — happily, no longer only "the boys on the bus" — is that our workload has just doubled

# Soviet economic statistics must become more reliable

The New York Times

The staff of the National Security Council ran amok in the Iran-contra affair President Reagan conceded that much even before appointing the Tower board to investigate what happened The Tower report subsequently warned that the NSC staff, so deeply engaged in hostage ransom and Nicaraguan intrigue, must never again become "operational" In other words, it is proper for the staff to make and coordinate policy, but dangerous to execute it.

Yet with only a paragraph of explanation, the Tower board recommended against any law forbidding the abuse Words like "operation" are difficult to define in practice and statute, the report said. "A legislative prohibition might prevent some future president from making a very constructive use of the NSC staff."

That proposition is not self-evident Congress must examine it Usually, legislative institutional solutions to problems caused by inadequate individuals is unfair But covert operations provides a notable exception Reagan now bans such covert activity by the NSC staff, but the Iran-contra affair shows how easily such bans can be ignored or secretly changed

Congress prohibited covert operations in Nicaragua by intelligence agencies The Reagan administration violated this ban by claiming the NSC staff was not an intelligence unit under the law and then running the forbidden operations through Oliver North and national security adviser John Poindexter

It should be easy to close this loophole for keeps The statute might simply specify that the NSC staff is covered by laws that apply to the CIA and other agencies Even more directly, it might bar resort to United States agency may conduct covert operations forbidden by Congress Tower and his colleagues should recommend to the White House machinery free of red tape But their solution — simple trust — has already been violated by this administration Reagan can simply countermand his new executive order with a whisper

## Independent

(ISPS 215 300)

| John K. Zollinger | Robert C. Zollinger | D Reed Eckhardt |
| Publisher | Vice President | Managing Editor |

THE GALLUP INDEPENDENCE Gallup, NM 87301 (505) 863-6611 Outside New Mexico (800) 546-5817 Additional News Offices

PINE BURCAU Monday March, AZ 86515 EASTERN BURCAU DURCAU, Thoreau, NM 87323
(505) 371 5443 (505) 862-7071

Published daily except Saturday and holidays by The Gallup Independent Co 500 N. Northurst Wilson (North Old 666) Wire service of the Associated Press and The New York Times Subscription rate Home delivery by carrier or motor route $5.25 per month in the retail zone Single copy 25¢ weekdays and 50¢ weekends By mail $73 80 a year, $36 90 for six months POSTMASTER Send address changes to THE GALLUP INDEPENDENT, P O Box 1210 Gallup, N M 87301 Entered as second class matter at the post office in Gallup, N M 87301

The desert shall rejoice and blossom as the rose Isaiah 35 °

# The Week's Wash

## By Veritas

DAYS OF OUR LIVES — WW doesn't usually take in washing We have enough dirty laundry of our own

But after that tourism report from Durango left town last weekend, we thought, shucks, anyone ought to be able to coordinate Gallup's tourism promotion, like the lady suggested.

So WW took on the job for a day We opened up a temporary office out on the front walk of City Hall in a booth made out of a couple of apple crates, Lucy style Our homerider sign read, "Free Tourism Information — The tourism counselor is IN"

"We've come to see the revolving door," said the first tourist.

"Yes," said his wife, a bleached blonde in sunglasses "We heard that Gallup's city administration is a regular revolving door Is this the right place?"

"Well, yes," said WW "This is the City Hall But, you see, there isn't actually a spinning door. That's just a figure of speech .. er, Why don't you try the Economic Development Group Office "

After the couple frumped away, a family of six drove up in a station wagon loaded down so the back bum per nearly dragged

"We've just been to the Grand Canyon," said the young father expectantly, "but we heard you have something just as good here "

WW stared incredulously .

"Red Rock Park is what I'm talking about," said the fellow. "Over in Flag they told us they heard Red Rock Park has cracks in it the size of the Grand Canyon, and we've come to see them That must really be something "

"Well," WW welled, "we never thought of showing them off as a tourist attraction. But, what the heck Go down here two blocks and hang a right The park is about seven miles out of town"

This tourism promotion stuff was going to be really easy.

The next tourist was a lone lady in a VW Rabbit.

"I'm a science teacher," she said cheerfully, "and someone told me your mayor's office has been apostacing in a vacuum. I'm interested to see how that works Can you direct me?"

"You'll have to hurry," WW told her "Just inside and to the left. But I have a feeling you're too late."

It was good to know that word about Gallup had spread so well, and it was fun meeting people and giving them directions, until two tall, mean guy suited-de types came by

"I'm agent Fvammis and this is agent Stanfran," one said, flashing open a dark wallet with gold leaf and fine black printing inside "We're here to investigate your City Coun cil."

"R right in there," WW stam mered "But it's not in session Just now C-can I direct you to any par ticular member?"

"We have received a report," said the other one, "that the council has been taken over by the Mexican Mafia What can you tell us about that?"

This was as crazy Word sure travels

fast

"Well, um, er, the new council hasn't met yet. But the new mayor is known for shooting first and asking questions later "

They patted the bulges under their coats

"B-but he doesn't take office until May 5," WW hurried on. "He's already taken one straw vote on replacing the city manager, however "

"That may be it," said agent Stanfran. "Did anything happen that might support our tip?"

"Well, it's only one instance, and it's pretty controversial," WW equivocated, "and I can't say if it's the start of a trend. But you can decide for yourself.

"The vote was Munoz, Mendoza, and Gutierrez on one side, and Richards and Hight on the other "

"Thank you," they said, striking into the city building.

Soth the science teacher came back out, a little red-faced. WW asked if she needed any further help.

"I told one of the secretaries that I had just seen the world's largest Navajo rug out at Chichobebeto and I had heard that in Gallup you had the world's biggest saw," the burst out.

"She gave me this poem and told me you probably wrote it, since you're in charge of coordinating all Gallup's tourism literature now."

"You can fool some people, but maybe not all,
That 71 percent may ask for recall
So don't get too anxious
and don't ride too high,
For that mighty position
may just pass you by
Yes, Eddie had it all,
the famous bore
But now we really know
who is the 'Big Zero' "

AS THE WORLD TURNS — Our no-prize buying name contest (Pg. 1 Thursday) is going slow Naturally we're beating out all the many Roe, Garrey, Evan, Peter, Paterson, Ivan, Bob and Eddie entries — and that doesn't leave much.