562 So.2d 731 (1990)
Sue FORD, Appellant,
v.
Charles ROWLAND, et al., Appellees.
Nos. 88-1608, 89-102.
District Court of Appeal of Florida, Fifth District.
May 3, 1990.
Rehearing Denied June 20, 1990.
*732 Scott D. Sheftall and Robert C. Levine of Floyd, Pearson, Richman, Greer, Weil, Zack & Brumbaugh, P.A., Miami, for appellant.
Sylvia K. Drusa and Linda S. Bols of Fisher, Rushmer, Werrenrath, Keiner, Wack & Dickson, P.A., Orlando and Tom G. Burrows of Raymond, Wilson, Burrows & Jester, P.A., Merritt Island, co-counsel for appellee Charles Rowland.
G.B. Mcvay Voght and Kary B. Reed of Hannah, Marsee, Beik & Voght, P.A., Orlando, for appellee Canaveral Port Authority.
Robert D. Gatton and M. Susan Sacco of Broad and Cassel, Maitland, for appellees Wesley Houser and Charlotte Houser.
Patricia K. Olney of Spielvogel and Goldman, P.A., Merritt Island, for appellee Cocoa Beach Area Chamber of Commerce.
*733 Stanley Wolfman of Wolfman & Greenfield, P.A., Merritt Island, for appellee Kenneth Karpinski.
Dwight W. Severs of Holland, Starling & Severs, P.A., Titusville, for appellee Thomas Newbern.
COBB, Judge.
The appellant, Sue Ford, an incumbent Port Commissioner of the Canaveral Port Authority, was the plaintiff below in an action against multiple defendants for libel, conspiracy to defame, and intentional infliction of emotional distress. The action concerned a poem written by a former Deputy Director of the Port Authority, Ken Karpinski. After circulation of the poem at a Cocoa Beach Area Chamber of Commerce social function on September 3, 1986, Ford sued Karpinski and the Port Authority (Port), as well as the Chamber of Commerce, Tom Newbern (Port Commissioner), Charles Rowland (Port Director), Wes Houser (former Port Commissioner), and the latter's wife, Charlotte Houser.
The poem apparently was written and circulated after a contested election for two seats on the Port Authority. Diana Greer and Bill Wenz were unsuccessful candidates for those seats. They were supported in the election by Ford, Tom Dolan (a friend of Greer), and the East Merritt Island Homeowners Association, whose president was Carol Hayes. The winning candidates in the election were Malcolm McLouth and Newbern. The poem read:
"AN ODE TO ELECTION NIGHT"
Was the night of elections, the votes being counted'
The air was electric, the tension mounted.
On East Merritt Island, that land of limbo,
Sat Suzie Commissioner, all dressed as a bimbo.
The table was set with great preparation
To celebrate their victory of Port condemnation.
Off in a corner in ill-fitting clothes,
Sat Diane and Tom stuffing crack up their nose.
They babbled of victory, consumed by desire;
While their brains left their bodies floating higher & higher.
Directing the party was the witch Carol Hayes,
Whose face was so wrinkled, it looked like a maze.
The mad witch of the East (Old Carol was called)
Since the crazy she led and the stupid enthralled.
I'll ruin the Port and the people I'll snooker,
Using lies and deceit  a junkie and a hooker.
"These ladies are experts, as commissioners they'd be stars, `cause they've handled many lines while working in bars".
"But their past is forgotten  not to be resurrected,
To the Public they're virtuous and should be elected".
"Now on to my task to create a frenzy  Of outrageous support for Diane and Wenzy".
"I've created a machine that cried "fraud and pollutants",
And place at the controls all EMIHOA mutants".
Then the votes started, and their numbers were rollin'
From the souls that were purchased by the coke lord,
Tom Dolan.
On Titusville and Cocoa and East Merritt Island
They all have been fooled  that's the reason I'm smilin'.
Then from the TV there arose such a clatter,
Carol flew on her broom to see what's the matter.
"This cannot be!" she shrieked her concern,
"The numbers are not the expected return".
"For the voters had chosen old Tommy and Mac,

*734 Instead of the goofball and Tom's Lady Crack".
Carol was livid and showing her loathing,
No chance for power and for Sue, no new clothing.
It just goes to prove when you're guided by witches,
Voters chose good guys, not Bimbos and Bitches.
 Anonymous
The trial court entered a summary judgment for the Port Authority on the basis of sovereign immunity, and that is the issue in Appellate Case Number 88-1608. Thereafter, Ford filed a third amended complaint against the remaining defendants, alleging that the poem was authored by Karpinski and that Rowland, Newbern, and Karpinski caused it to be dispensed from the offices of the Port Authority. Various defendants were charged with disseminating the poem at the Chamber of Commerce's "Wednesday-Friendsday" gathering on September 3, 1986. Additionally, Ford also alleged that the Chamber, through its agents, retyped the poem and added the title "An Ode to Election Night." All the defendants were alleged to have acted with bad faith, malicious purpose, recklessly, and/or negligently. The trial court dismissed the third amended complaint with prejudice, giving rise to Appellate Case Number 89-102. The two appeals have been consolidated.
We have no problem in affirming the summary judgment for the Port Authority in Case Number 88-1608. The only allegations against the Port related to libel. It was alleged that the Port, through the reckless and/or negligent acts of its employees, "negligently allowed the poem to be dispensed from its offices" to various individuals.
The Port argues that Ford, as a public figure, was required to show that publication of the poem was done with actual malice  i.e., that the employees of the Port Authority published the libel (the poem) knowing it was false or with reckless disregard for its truth or falsity. See New York Times Company v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). See also Times Publishing Company v. Huffstetler, 409 So.2d 112 (Fla. 5th DCA), review denied, 417 So.2d 329 (Fla. 1982). But, pursuant to section 768.28, Florida Statutes (1985), the Port Authority has sovereign immunity for actions of employees done in bad faith, with malicious purpose, or in willful and wanton disregard of another's rights. Bad faith has been equated with the actual malice standard. St. Amant v. Thompson, 390 U.S. 727, 732-733, 88 S.Ct. 1323, 1326-27, 20 L.Ed.2d 262 (1968). In other words, the plaintiff, as a public figure, cannot establish liability without simultaneously establishing the tort immunity of the Port Authority. Mere negligent publication of such libel, relied upon by plaintiff in an attempt to circumvent the statutory immunity, is not sufficient in actions involving a public, as opposed to a private, figure. Cf. Miami Herald Publishing Company v. Ane, 458 So.2d 239 (Fla. 1984). It is undisputed that Sue Ford, as an elected official, is a public figure. Accordingly, the summary judgment for the Port Authority in Case Number 88-1608 must be affirmed.
In Appellate Case Number 89-102, the dismissal with prejudice of the complaint against the defendants other than the Port Authority does not involve sovereign immunity. The appellant contends, and we agree, that if an allegedly defamatory publication is reasonably susceptible of two meanings, one of which is defamatory and one of which is not, it is for the trier of fact to determine the meaning understood by the average reader. See Perry v. Cosgrove, 464 So.2d 664 (Fla. 2d DCA 1985); Miami Herald Publishing Company v. Ane, 423 So.2d 376, 389 (Fla. 3d DCA 1982), approved, 458 So.2d 239 (Fla. 1984); see also, Belli v. Orlando Daily Newspapers, Inc., 389 F.2d 579 (5th Cir.1967), cert. denied, 393 U.S. 825, 89 S.Ct. 88, 21 L.Ed.2d 96 (1968).
It is readily apparent that the "Suzy Commissioner" in the poem refers to Sue Ford; moreover, the poem reasonably can be read, although not necessarily so, as referring to Ford as a "hooker." Another *735 reading would be that the terms "junkie" and "hooker" in the eighth stanza refer to Tom Dolan and Diana Greer, respectively. Statements which impute unchastity on the part of a woman plaintiff are libelous per se. See Campbell v. Jacksonville Kennel Club, 66 So.2d 495, 497 (Fla. 1953). The term "hooker," without dispute, refers to a prostitute.[1] Thus, if the finder of fact determined that the term "hooker" factually referred to Ford, libel per se would be established  unless the poem could not reasonably be read as describing an actual fact about Sue Ford or an actual event in which she participated. See, e.g., Hustler Magazine v. Falwell, 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988); Dworkin v. Hustler Magazine, Inc., 668 F. Supp. 1408 (C.D.Cal. 1987), aff'd, 867 F.2d 1188 (9th Cir.1989). As stated in Dworkin, a defamatory publication must "convey to a reasonable reader the impression that ... [it] describe[s] actual facts about the plaintiff or activities which she participated in to be actionable."
If a publication reasonably asserts a factual charge which is defamatory, even in a humorous or satirical vein, we are unaware of any first amendment protection. As conceded by the appellant, it is initially the function of the trial court to determine whether a publication is an obvious expression of humor or, on the other hand, is susceptible of being read as an assertion of defamatory fact. In making this assessment, the court must consider the context in which the statement was published, the medium by which it was disseminated, and the recipient audience. See Information Control Corp. v. Genesis One Computer Corp., 611 F.2d 781 (9th Cir.1980). Some statements are so obviously comedic and nonsensical that no sensible person would take them seriously. See, e.g., Polygram Records, Inc. v. Superior Court (Rege), 170 Cal. App.3d 543, 216 Cal. Rptr. 252 (1985); Frank v. National Broadcasting Co., Inc., 119 A.D.2d 252, 506 N.Y.S.2d 869 (1986). Other statements are more questionable, and require submission to the trier of fact rather than resolution by the court as a matter of law. See, e.g., Perry, supra; Wolfson v. Kirk, 273 So.2d 774 (Fla. 4th DCA), cert. denied, 279 So.2d 32 (Fla. 1973). In the Falwell case the question of whether a suggestion that Reverend Falwell engaged in a sexual act in an outhouse with his mother could be understood as describing an actual fact, or was merely an absurd parody, was submitted for a jury determination by the trial court. See also, Harwood v. Bush, 223 So.2d 359 (Fla. 4th DCA 1969).
In the instant case it can be said, as a matter of law, that witches on broomsticks are fiction and fantasy; but "hookers" are real. Basic factual disputes are raised by the dismissed complaint: Does the word "hooker" refer to Sue Ford? If so, can that term reasonably be understood to describe an actual fact about, or conduct of, Sue Ford? Or, on the other hand, is the poem complete fantasy and hyperbole which cannot be taken literally in regard to the accusation that Sue Ford is  or once was  a "hooker?"
Accordingly, we reverse the dismissal of the libel and conspiracy[2] counts of the Third Amended Complaint against the defendants named therein. We affirm the dismissal of the count which attempts to allege intentional infliction of emotional distress because the allegations therein do not set forth an independent tort,[3] nor do they posit a factual situation rising to the *736 level of "outrage."[4]
The judgment in Case Number 88-1608 is AFFIRMED; the judgment in Case Number 89-102 is AFFIRMED in part and REVERSED in part; and the latter case is REMANDED for further proceedings consistent with this opinion.
W. SHARP, J., concurs.
GRIFFIN, J., dissents with opinion.
GRIFFIN, Judge, dissenting.
I respectfully dissent because I believe that, although "Ode to Election Night" is tasteless and offensive, it cannot support a defamation claim in favor of the plaintiff in this case. The plaintiff was a public official, a member of the Port Commission of the Canaveral Port Authority, who held office through popular election. Although this fact does not make her "defamation proof", it places her in a posture less susceptible to defamation claims.
In the years since New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) announced the "actual malice" requirement for defamation actions brought by public officials, courts have struggled intensely with the far more difficult question of what is defamation of a public official, especially where, as here, the alleged defamatory statement is contained in a satirical piece. As the commentary and the cases demonstrate, there is as yet no widely accepted formula to test statements made about public figures for defamatory content. See, e.g., Note, The Illusion of the Fact-Opinion Distinction in Defamation Law, 39 Case W.Res.L.Rev. 867 (1988-89).[1] One of the best and most extensive (79 pages) discussions of this issue is found within the various opinions of the judges of the District of Columbia Court of Appeals in the case of Ollman v. Evans, 750 F.2d 970 (D.C. Cir.1984), cert. denied, 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985), most particularly the celebrated concurring opinion of Judge Robert Bork.
The majority opinion in Ollman had focused strictly on the opinion/fact dichotomy that had emerged after the Supreme Court's decision in Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). Because an opinion could not be defamatory, some courts after Gertz began detailed analyses of allegedly defamatory statements about public figures to determine whether the statements were fact or opinion. A statement that would appear in isolation to be fact has been held to be opinion when viewed in "totality in the context in which it was uttered or published". Information Control Corp. v. Genesis One Computer Corp., 611 F.2d 781, 784 (9th Cir.1980). Thus, an allegation that a public figure had engaged in blackmail, was a traitor, a fascist, a Marxist or the like became a protected expression of opinion rather than a statement of fact capable of supporting a claim of defamation.
Judge Bork's concurring opinion endorsed more broadly a "consideration of the totality of the circumstances in which the statement occurs and which determine both its meaning and the extent to which making it actionable would burden freedom of speech or press." 750 F.2d at 997. One of the strongest factors to take into account, according to Judge Bork, was that the subject of the alleged defamatory statement had "placed himself in the political arena" and had become the subject of political debate. 750 F.2d at 1002. Such statements about the political figure have to be read in the context of controversy and combat because, in such circumstances, the emergence of rhetorical hyperbole is likely. As Judge Bork said:
In deciding a case like this, therefore, one of the most important considerations *737 is whether the person alleging defamation has in some real sense placed himself in an arena where he should expect to be jostled and bumped in a way that a private person need not expect. Where politics and ideas about politics contend, there is a first amendment arena. The individual who deliberately enters that arena must expect that the debate will sometimes be rough and personal.
750 F.2d at 1002. He points out that in the sometimes highly-charged atmosphere of political campaigns, many "cruel and damaging things" are said about candidates for political office; however, people who engage in controversy must accept such statements "as their lot... . [that] the first amendment demands a hide that tough." 750 F.2d at 1005. Thus, even though statements made about political figures may have been made with actual malice, they may be protected because the context in which they appear alerts the reader or listener that the statements are not to be taken as factual. 750 F.2d at 1005.
Judge Bork explains the crucial role of the judiciary in making the threshold determination whether statements made about public figures can be defamatory. He argues persuasively that one important role of the judiciary is to ensure that cases about speech and writing, being essential to a vigorous first amendment, do not reach the jury. 750 F.2d at 1006. Judge Bork warns that unless courts exercise their duty to make this threshold determination as a matter of law, the actual malice test of Sullivan will prove inadequate protection for first amendment rights. 750 F.2d at 1005-1006.
Following publication of the Ollman case, a number of courts attempted to devise "four-factor frameworks, three-prong tests and two-tiered analyses" of the sort eschewed by Judge Bork, in an effort to articulate what is, at bottom, a rather subjective analysis.[2] For example, the Fourth Circuit Court of Appeals has recently outlined the analysis as follows: first of all, a preliminary determination should be made whether the allegedly defamatory statement is an apparent expression of fact or opinion. If the statement is capable of being true or false, it is not clearly opinion. Three additional factors then must be considered to determine whether, in context, the apparent fact is not factual after all because a reasonable reader would recognize the "weakly substantiated or subjective character" of the statement and discount any factual content. The three additional factors to be considered are: (1) the author's choice of words; (2) the context of the statement within the writing as a whole; and (3) the broader social context into which the statement fits. Blue Ridge Bank v. Veribanc, Inc. 866 F.2d 681 (4th Cir.1989).[3]
Applying these criteria, I conclude that the poem in question is not defamatory as to this plaintiff. I agree with the majority that the focus of inquiry has to be the use of the word "hooker" because no other allusion to this plaintiff in the poem is even arguably defamatory. The inference that Sue Ford is or was a "hooker" does meet the threshold test in that it is capable of being true or false. However, applying the additional factors, this statement is clearly something that a reasonable reader would recognize as being weakly substantiated or subjective in character and not defamatory.
First of all, the choice of the word "hooker" itself indicates a lack of intent to communicate a serious claim. "Hooker" is a slang expression that does not even appear in the Oxford English Dictionary. I think the average reader would agree that the word that most seriously and directly describes a person who sells sex for money is *738 the word "prostitute". On the other end of the continuum is the word "whore" which has come to have a far broader secondary meaning, including anyone who "sells out" for money whether it be sex, integrity, public office or expertise. In this case, the author chose the term "hooker" (perhaps because he needed something to rhyme with "snooker") and although "hooker" lacks the breadth of use that other synonyms for prostitute, like "whore", have developed, it also has diverse other meanings unrelated to prostitution. The use of such a weak slang term is not determinative, but it does weigh against a finding of factual content.
The second consideration, the context of the statement within the writing, is very important. In the first place, I agree with the majority that even though the word "hooker" can be read to refer to Sue Ford, it can also be read as referring to someone else, namely "Diane", who was clearly identified seven lines earlier as sitting with a person "stuffing crack up their nose". Even more important than the obscurity of the reference, however, is the format. This alleged defamatory statement of fact is contained in a piece of third-rate doggerel captioned with a mock-romantic title and written in ill-rhymed couplets roughly reminiscent of, and containing allusions to, "The Night Before Christmas". Indeed, the word "hooker" appears in the one place least calculated to convey any serious intent  as the last word in line 16, where it is paired to rhyme with the word "snooker", a playful, if not silly word. The entire text of the "poem" simply belies any serious factual intent. It purports to portray a fictional event, a Port "condemnation party", at which the "mad witch of the East", the leader of the "crazy" and "stupid", who uses a broom for transportation, manipulates "a junkie and a hooker" for the purpose of "ruin[ing] the Port", and placing "mutants" at the controls of a `"fraud and pollutants"' machine while her disciples get so high on drugs that their brains float out of their bodies. This ersatz humorous setting is a strong indicator of rhetorical hyperbole. Mendoza v. Gallup Independent Co., 107 N.M. 721, 764 P.2d 492 (Ct. App. 1988).
The third consideration, the social context into which the statement fits, also strongly points to the non-factual nature of the statement in question. It is undisputed that this document was prepared in the wake of an extremely hard-fought, even nasty, election involving matters of considerable importance to the author and the persons to whom the document was disseminated. The cases clearly recognize that, in the context of such highly-charged, emotional political battles, things will be said that may be false, may even be maliciously stated, but are not reasonably to be taken as a serious statement of fact. Ollman, 750 F.2d at 1005. Viewed in context, this poem cannot be seen as making the serious factual allegation that Sue Ford either is or at one time was a prostitute.
The most analogous among the recent cases I have found that apply the factors discussed above, as well as others that have emerged, is the case of Hoppe v. Hearst Corp., 53 Wash. App. 668, 770 P.2d 203 (1989). In that case, the local tax assessor was made the subject of a satirical piece in which he was dubbed "Hurley Herpes". Alleging, inter alia, this assertion that he had a loathsome, sexually transmitted, communicable disease was defamatory, Hoppe sued. The court dismissed his claim concluding that, considering the context of the statements and their tone, the column did not allege defamatory facts as a matter of law. 770 P.2d at 207.
The foregoing analysis is consistent with Florida law. In Palm Beach Newspapers, Inc., v. Early, 334 So.2d 50 (Fla. 4th DCA 1976), cert. denied, 354 So.2d 351 (Fla. 1977), cert. denied, 439 U.S. 910, 99 S.Ct. 277, 58 L.Ed.2d 255 (1978), the court was presented with "several hundred" "slanted, mean, vicious" "derogatory articles and cartoons" about an elected school superintendent and made a contextual analysis to determine whether the allegedly defamatory statements were fact or opinion. See also Nodar v. Galbreath, 462 So.2d 803, 810-811 (Fla. 1984) (whether statement is defamatory fact or expression of opinion is *739 a question of law). See also Shiver v. Apalachee Publishing Co., 425 So.2d 1173 (Fla. 1st DCA 1983).
I do not quarrel with the majority's view that a false statement that this plaintiff either is or was engaged in prostitution could, in a proper case, sustain a lawsuit, but this "poem" is pure rhetorical hyperbole and as such is not actionable. Under these circumstances, the issue of defamation is not a question for the jury to decide; courts have an initial screening function. I am troubled that the decision to send this case to the jury threatens first amendment rights; nevertheless, it is some consolation to know that, in Florida, bad poetry does not go unpunished.
NOTES
[1] The 1988 edition of Webster's New World Dictionary of American English identifies "hooker" as slang derived from the term given to residents of Corlear's Hook area in New York City, known for the large number of brothels frequented by sailors. See also A Dictionary of Americanisms on Historical Principles (M. Matthews, 1st ed. 1951).
[2] Conspiracy is not a separate or independent tort but is a vehicle for imputing the tortious acts of one coconspirator to another to establish joint and several liability. See Nicholson v. Kellin, 481 So.2d 931 (Fla. 5th DCA 1985).
[3] See Boyles v. Mid-Florida Television Corporation, 431 So.2d 627 (Fla. 5th DCA 1983), aff'd, 467 So.2d 282 (Fla. 1985). See also M.M. v. M.P.S., 556 So.2d 1140 (Fla. 3d DCA 1989).
[4] See Food Fair, Inc. v. Anderson, 382 So.2d 150 (Fla. 5th DCA 1980).
[1] Also, in 1988, a distinguished panel assembled by the Annenberg Washington Program published their Proposal For The Reform of Libel Law, which included recommendations for identifying defamatory statements of fact. It was recommended that "rhetorical hyperbole, verbal abuse, name calling, ridicule or jest and statements contained in a satire, parody or political commentary presumptively be construed as opinion".
[2] 750 F.2d at 994.
[3] The Eighth Circuit Court of Appeals has devised a four-prong test and has stated the issue to be whether, under the totality of the circumstances, the first amendment will protect a given statement. The four factors are: (1) specificity, i.e., how precise or singular of meaning is the statement and does it recite to specific factual events; (2) verifiability; (3) literary context; and (4) public context, which includes a presumption that statements made in the course of political debate are likely to be understood as opinion. Price v. Viking Penguin, Inc., 881 F.2d 1426 (8th Cir.1989).